Jose **LOPEZ**, Arturo Flores, and Rufina Herrera Vargas, Plaintiffs,

v.

Barry **SILVERMAN**, individually d/b/a **RENAISSANCE SPORTSWEAR, LTD.;** Richard Pak; Peter Pak; Tuk Cha Pak, individually d/b/a Woo Brothers, Inc.; and Han Byul, Inc., Defendants.

No. 96 CIV. 9263(DLC).

United States District Court, S.D. New York.

July 23, 1998.

Catherine Ruckelshaus, James M. Williams, Jenny R. Yang, National Employment Law Project, Inc., New York City, for Plaintiffs.

Alan B. Pearl, Syosset, NY, for Defendants.

## OPINION and ORDER

COTE, District Judge.

Before the Court are cross-motions for summary judgment in this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and New York Labor Law Section 650 *et seq.* The essential allegations of plaintiffs Jose Lopez ("Lopez"), Arturo Flores ("Flores"), and Rufina Herrera Vargas ("Vargas"), three garment pressers in New York City's garment district, are that the defendants were their employers, and that these employers failed to pay them overtime compensation at the rates required by the above-referenced statutes. Defendant Barry Silverman ("Silverman"), the only one of the defendants to participate in these motions, contends that neither he nor the company for which he is principal, Renaissance Sportswear, Ltd. ("Renaissance"), was the plaintiffs' employer, inasmuch as the plaintiffs were employed at all relevant times by the other defendants, three members of the Pak family and their family-owned garment-sewing businesses. For the reasons set forth below, the Court concludes that all of the defendants, for at least some portion of the relevant time period, acted effectively as the plaintiffs' employers within the meaning of

the FLSA and New York Labor Law, and therefore were obligated to pay the overtime wages of at least two of the plaintiffs pursuant to those statutes. Accordingly, the Court grants in part and in part denies the motions for summary judgment by both the plaintiffs and Silverman.

## BACKGROUND

### A. *Procedural History*

The plaintiffs commenced this action on December 10, 1996, alleging federal question jurisdiction on the basis of their claim under the FLSA. The defendants named in the Complaint are Silverman, individually and doing business as Renaissance, and the Paks—Han Bae ("Richard") Pak, his wife Tuk Cha ("Lucy") Pak, and their son Peter Pak—all of whom were sued in their individual capacities and doing business as Woo Brothers, Inc. ("Woo") and Han Byul, Inc. ("Han"), the two businesses they owned and controlled. Without benefit of counsel, the Paks answered the Complaint on behalf of themselves and purportedly on behalf of Woo and Han. Silverman, acting through counsel on behalf of himself and Renaissance, moved to dismiss the Complaint under Rules 4(a) and 12(b)(6), Fed.R.Civ.P., or for a more definite statement pursuant to Fed.R.Civ.P. 12(e). Silverman's motion was denied on April 11, 1997, after which he filed an answer.

On January 8, 1998, following extensive discovery, the plaintiffs moved by Order to Show Cause for a default judgment against Woo and Han on the ground that these corporate defendants had failed to retain counsel to represent them, as they were of course obliged to do. *See, e.g., Eagle Assocs. v. Bank of Montreal,* 926 F.2d 1305, 1308 (2d Cir.1991); *In re Sharon B.,* 151 A.D.2d 794, 543 N.Y.S.2d 124, 125 (N.Y.1988). When neither Woo nor Han appeared by counsel at the hearing on that motion, the Court entered the requested judgment against both defendants, for liability purposes only, pursu-

ant to an Order and a Default Judgment dated January 23, 1998.

The plaintiffs and Silverman (on behalf of himself and Renaissance) thereafter filed the instant cross-motions, with the plaintiffs seeking summary judgment against Silverman, Renaissance, and the Paks individually; and Silverman (and Renaissance) seeking summary judgment against all of the plaintiffs.[1] The Paks, apparently representing themselves pro se, have failed to participate in any respect in the briefing of these motions, notwithstanding their participation in the preceding discovery. Plaintiff Flores, who now resides in Mexico, likewise has declined to participate in these motions, insofar as he has evidently taken no part whatever in formal discovery, whether by choice or otherwise. Silverman contends that Flores will not appear for trial; that defense counsel requested to take Flores's deposition but was unable to do so given Flores's absence from the country; and that grounds therefore exist for dismissal of Flores's claims pursuant to Rule 37(d), Fed.R.Civ.P. The plaintiffs counter that there is no support for the assertion that Flores will not appear for trial, and they insinuate that Silverman simply declined to accept any of the alternative formats that they proposed for carrying out Flores's deposition. Nevertheless, neither the plaintiffs' moving papers, nor their papers in opposition to summary judgment, contain any affidavits or other admissible evidence in support of Flores's claims, or on his behalf.

### B. *Facts*

Although the parties purport to "deny" numerous of each others' assertions of undisputed facts, many of these denials are wholly unsupported by specific factual allegations or other competent evidence, and thus are ineffective as responses to a motion for summary judgment. *See* Rule 56(e), Fed.R.Civ.P.; *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). Consequently, with regard to at least some portions of the time periods at issue, the pertinent facts

---

1. While the plaintiffs seek summary judgment against both Silverman and Renaissance (as well as the Paks), and Silverman opposes that motion and moves for summary judgment on behalf of

both himself individually and doing business as Renaissance, the participating parties agree that this action is stayed at present with respect to Renaissance, as that entity is in bankruptcy.

are either admitted or in this context undisputed. Summary judgment is therefore appropriate, because even when viewing the evidence in the light most favorable to the respective non-movant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the parties' submissions taken together "show that there is no genuine issue as to any material fact and that the moving party," in at least some instances, "is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

Renaissance is a garment manufacturer, located on West 36th Street in New York City, that designs, produces, markets, and sells women's clothing for resale to the public via retail clothiers, department stores, and other outlets. Silverman is the founder, owner, president, and sole shareholder of Renaissance, most aspects of which he personally oversees and operates on a daily basis. Specifically, Silverman's involvement includes designing, sketching, and marketing some of the garments himself; making all business decisions; hiring, firing, and setting salaries for all employees; and negotiating with contractors. Prior to opening Renaissance in 1991, Silverman had approximately 20 years of experience in the garment industry.

Generally speaking, Renaissance functions as a garment "jobber," designing and producing garments, and then contracting out subsequent phases of the assembly process— such as cutting and sewing—to other entities employing production workers who perform these tasks according to Renaissance's specifications. With respect to sewing, for example, Renaissance supplies its contractors with virtually all of the materials and instructions necessary to sew and assemble the finished garments (with the exception essentially of thread), including patterns, pre-cut fabric, cutting control sheets, detailed sewing instructions, and trimmings such as zippers, buttons, shoulder pads, registration labels, care tags, etc. Renaissance determines the turn-around times that the contractors are required to meet for individual production jobs, usually between three weeks and three months, based on the completion dates requested in the purchase orders that Renaissance receives from its retail customers. For example, Renaissance might deliver to its sewing contractor all of the production materials necessary for a given project anywhere from one month to a few days prior to the completion date. Finally, Renaissance, particularly through Silverman in his capacity as its president and sole shareholder, closely monitors the quality of the garments that it produces and sends out for assembly by, among other things, maintaining contact with the contractors through at least occasional on-site visits of their facilities by Renaissance production managers and/or Silverman.

Woo and Han were two such contractors that performed sewing and pressing operations for Renaissance. The two companies were in essence successor corporations, both owned and run by the Pak family out of the same location on 8th Avenue in New York City. Woo commenced doing business some time in 1993, and remained in existence until approximately January 1996; Han was started in approximately February 1996, and closed some time in June of that year. Woo was owned and operated by Lucy and Peter Pak, who also evidently acted as its officers, with the assistance of Richard Pak. In establishing Woo, the Paks assumed the debt, factory space, and equipment of a prior contractor, to whom they also paid $1,000; purchased an additional ten sewing machines; and paid rent to the building landlord. The Paks hired, supervised, and prepared and managed the payroll for all of their production workers, who sewed and pressed garments for Renaissance and other manufacturers.

Each of the plaintiffs worked as a garment presser for Woo, and then Han, from some point in 1994 until June 1996. The plaintiffs have presented evidence as to the hours they worked, their salaries, and the Paks' payment practices, all of which purports to show that Han and Woo regularly denied the plaintiffs proper compensation, under federal and state law, in consideration of the number of hours they worked. Specifically, the plaintiffs assert that Lopez is owed $3,281.40

in overtime payments, that Vargas is owed $3,416.40, and that Flores is owed $2,941.20. Silverman issues a naked denial as to these amounts, yet he adduces no facts or allegations to demonstrate their falsity or unreliability. Nevertheless, Silverman is correct that the information and calculation of amounts with respect to Flores is derived solely through an affidavit from one of the plaintiffs' attorneys, and not through any testimony or statements by Flores.

From February 1995 to March 1996, Woo performed an average of approximately one-fifth of Renaissance's garment production work, with the remaining 80 percent ostensibly being performed by other contractors. The parties dispute the percentage of Woo's work that was comprised of projects for Renaissance; while Silverman asserts only five to 15 percent of Woo's work was for Renaissance, the plaintiffs argue that the figure at times approached 95 percent. Both sides are able to point to at least some evidence in the record in support of their claims.

For any given job, Renaissance generally paid Woo (and later Han) by the piece. That is, Renaissance would determine, pursuant to certain criteria, the rate that it would pay for each garment produced according to its specifications. The standard fees ranged from $1.50 to $3.50 per garment, although the Paks apparently had some ability to negotiate for a slightly higher rate, approximately 25 cents per piece, for some more complex assignments. Woo and Han were paid only after successfully completing a job, i.e., following inspection of the completed garments by Renaissance personnel either at its facility or the Paks' shop, and payment was usually made weekly, for garments produced during that week. Peter Pak did testify, however, that perhaps on one occasion during Han's existence Renaissance paid the Paks a percentage of the fee due on a job "in advance prior to receiving the whole shipment,"

where Renaissance had been very late in delivering some component of the production, such as trimming, and the Paks were in danger of losing money and had to "make payroll." When a production was completed and inspected, the garments were either picked up by Renaissance or delivered to it, after which Renaissance sold the garments to its retail and other customers.

Peter Pak left Woo in approximately October 1995 to begin work as a production manager for Renaissance. Lucy Pak continued to operate Woo until some time in January 1996, at which point the business closed. Three or four weeks later, Lucy Pak opened Han in the same location and using the same machinery as Woo, and employing at least some (if not all) of the same workers. Peter Pak had no official relationship with Han; he was not an officer of the company, and his mother, Lucy, was its sole owner. While the plaintiffs allege that Woo began performing an increasing percentage of Renaissance's work from the time that Peter Pak left for the Renaissance production manager job, it is undisputed in any event that Han performed an average of 75 percent of Renaissance's work,[2] and that such work comprised at least 80 percent—and perhaps approaching 95 to 100 percent—of Han's total business.[3] Indeed, given these circumstances, Richard Pak testified that when Renaissance gave Han fewer work orders, Han would tell its workers to stay home until it had work for them to do.

During the roughly five months of Han's existence, Peter Pak, as Renaissance production manager, maintained very close and frequent contact with his mother's company, directly checking the quality of Han's work so as to ensure that it met Renaissance's specifications, and directly communicating with Han's workers and his mother, Han's principal, about problems and performance. For example, whereas a prior Renaissance

---

**2.** Silverman purports to deny this allegation, but his denial cites only to a single set of interrogatory responses that plainly support the contention.

**3.** Richard Pak estimated that 80 to 85 percent of Han's work was comprised of work for Renaissance. On the other hand, Peter Pak, who was intimately involved in the operations of Woo and, as explained in the text, played a central role in

the interactions between Renaissance and Han, stated that "[n]early all" of Han's work was for Renaissance. Indeed, Peter estimated that the percentage of Han's work that was performed for Renaissance was "around 90, 95, a hundred ... very close to full, fully doing just Renaissance [work]."

production manager, Raoul Martinez, visited Woo to check the specifications of garments approximately twice a week, for up to two hours at a time, Peter Pak, after assuming the production manager job, made such quality assurance visits to Han on an "[a]lmost daily basis," and at minimum "no less than three days" per week, for up to "three hours, depending on the necessity."

It is conceded for purposes of this motion that Peter Pak and/or Martinez, on at least one occasion, did personally and specifically instruct Han workers and the Paks on how garments were to be sewn and pressed. Similarly, Silverman admits that on at least one occasion he personally inspected garments at Woo and/or Han and showed an employee how to press a garment. Moreover, in his capacity as the company's president and shareholder, Silverman also generally monitored the quality of the garments produced by contractors for Renaissance. For example, he met daily with his production managers to discuss the status of projects, as well as the production manager's responsibility for conducting on-site checks of contractors' work. In addition, either Silverman or his production manager communicated directly with contractors such as Woo and Han, through verbal or written instructions, when garments had not been produced according to Renaissance's specifications, and adjustments were required. In these circumstances, when corrections had to be made or garments were "a little sloppy," the testimony shows that Renaissance still did not reduce its scheduled payments to the Paks.

Nevertheless, it is undisputed that neither Silverman nor any other Renaissance employee exercised direct control over the wages or hours of the Paks' workers, including the plaintiffs, or the funding and management of Woo or Han. Specifically, Silverman and/or Renaissance did *not* directly: hire or fire the Paks' employees; determine those employees' hours, set their rates of pay, or manage the payroll of Woo or Han; assist Woo or Han with the rental or purchase of equipment, or the rent for their factory space; or invest any funds in Woo or Han.

In keeping with the foregoing, Peter Pak, as Renaissance production manager, also took no part in hiring or firing workers at Han and never helped his mother "with supervising" them. Rather, he states that on his visits to Han he "just was there to look out for the interests of Renaissance," as "an agent of Renaissance." Peter Pak did serve, however, as the "go-between" in negotiating contract prices between Renaissance and Han, *i.e.,* between Silverman, who would set the price, and Pak's mother Lucy, who as noted had some limited ability to negotiate a small increase. In addition, Peter Pak on at least one occasion inspected Han's payroll records "[t]o make sure in the interests of Renaissance that all the wages were being paid on time and properly."

As a Renaissance representative, Peter Pak specifically retained the right to conduct such payroll inspections, at least after May 1996, pursuant to an agreement between Renaissance and Han. That agreement followed an investigation of Han by the United States Department of Labor ("DOL"), in May 1996, for failure to pay overtime. As a result of the investigation, the Paks entered into a settlement agreement with DOL on behalf of Han, whereby they agreed to pay 13 weeks of overtime for the period from December 10, 1995, to March 9, 1996. Also in response to the investigation, Silverman commissioned the drafting of a contract that he required all of his garment contractors to sign as a condition of doing business with Renaissance. The contract provided that, in light of Renaissance's intent to comply with the FLSA and DOL regulations, the contractor agreed, *inter alia,* to comply with all FLSA wage and hour provisions; to keep payroll records and supply them to Renaissance upon request; and to permit Renaissance to monitor the contractor's compliance with the FLSA through quarterly spot checks, unannounced inspections, employee interviews, and the like. Finally, the contract provided that Renaissance would be reimbursed for any back wages that it paid on the contractors' behalf, and that Renaissance could terminate the garment contract at issue without recourse if the contractor failed to comply with any of its provisions.

It is accepted for purposes of this motion that the Paks breached their agreement with DOL. Whether due to Han's troubles with DOL or a decrease in the quality of Han's work, Renaissance stopped contracting out production jobs to Han in June 1996, and Han ceased operations soon thereafter. All three of the Paks testified in essence that the loss of Renaissance's business forced Han to close. When that occurred, Han was evicted from its factory space and its equipment was sold to pay off its outstanding rent.

## DISCUSSION

Given that it is undisputed, for purposes of this motion, that at least plaintiffs Lopez and Vargas were denied proper overtime compensation during the period in which they worked at Woo and Han, the only issue for the Court at present is whether the defendants—or more precisely, which of them, and for what periods of time—were the plaintiffs' employers within the meaning of the FLSA and New York Labor Law, and therefore responsible for paying those outstanding overtime wages.[4] These inquiries necessitate a close examination of the pertinent statutes, the implementing regulations, and the cases interpreting both.

### A. Statutory Framework

The FLSA defines "employee," with certain exceptions not relevant here, as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The statute in turn provides that "employ" "includes to suffer or permit to work," id. § 203(g), and that "employer," in relevant part, "includes any person acting directly or indirectly in the interest of an employer," id. § 203(d). See also Danneskjold v. Hausrath, 82 F.3d 37, 40 (2d

Cir.1996); Brock v. Superior Care, Inc., 840 F.2d 1054, 1058 (2d Cir.1988). In reviewing these sections, the Second Circuit has remarked upon "the expansive nature of the FLSA's definitional scope." Frankel v. Bally, Inc., 987 F.2d 86, 89 (2d Cir.1993). See also Superior Care, 840 F.2d at 1058 ("The definition is necessarily a broad one in accordance with the remedial purpose of the Act."). Indeed, the Supreme Court has noted that the FLSA "defines the verb 'employ' expansively," with "striking breadth," and in such a way as to "stretch[ ] the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). See also Rutherford Food Corp. v. McComb, 331 U.S. 722, 728, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); United States v. Rosenwasser, 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 89 L.Ed. 301 (1945) (noting that FLSA's definition of employee has been called the "'broadest definition that has ever been included in any one act'") (quoting 81 Cong. Rec. 7,657 (1938) (statement of Sen. Black)); Frankel, 987 F.2d at 89.

In addition, DOL regulations promulgated under the FLSA recognize that an employee may have more than one employer under the statute's broad definitions:

A single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA], since there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer....

4. The plaintiffs assert that New York Labor Law is virtually identical to the FLSA with respect to coverage and overtime requirements, and that a violation under the FLSA constitutes a violation of the New York Labor Law's minimum wage act and regulations. The defendants have not disputed this assertion, and indeed, neither party in all the rounds of briefing on these motions has cited a single New York state case on the issue of whether the defendants, or any of them, may be deemed the plaintiffs' employers and therefore responsible for paying their overtime wages. Given the parties' apparent concession that the

legal issues involved in the plaintiffs' state-law causes of action are governed by the same standards as those applicable to their FLSA claims, along with the fact that New York Labor law defines "employee" in the same broad manner as does the FLSA, i.e., as "includ[ing] any individual employed or permitted to work by an employer in any occupation," see N.Y. Labor Law § 651(5) (listing numerous exceptions), the Court will consider exclusively federal law in resolving the question whether the defendants were the plaintiffs' employers for purposes of paying them overtime wages.

29 C.F.R. § 791.2(a). *See also, e.g., Torres–Lopez v. May,* 111 F.3d 633, 638 (9th Cir. 1997). This circumstance, known as "joint employment," arises where "the facts establish that the employee is employed jointly by two or more employers, *i.e.,* that employment by one employer is not completely disassociated from employment by the other employer(s)." 29 C.F.R. § 791.2(a). In such situations,

> all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the [FLSA] ... [and] all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA], including the overtime provisions ....

*Id.* Finally, the regulations provide examples demonstrating when "a joint employment relationship generally will be considered to exist," which includes circumstances where the employee "performs work which simultaneously benefits two or more employers," and:

> (1) ... there is an arrangement between the employers to share the employee's services ...; or (2) ... one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or (3) ... the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Id.* § 791.2(b) (footnotes omitted).[5] As with the underlying statutory definitions from which it derives, courts recognize that "the concept of joint employment should be de-fined expansively under the FLSA." *Torres–Lopez,* 111 F.3d at 639.

### B. *Individual Defendants' Liability Under the FLSA*

 As an initial matter, Silverman argues that, even if for some reason Renaissance is found to have been the plaintiffs' employer, he personally cannot be held liable for any overtime payments that the company may owe the plaintiffs, inasmuch as he never transacted business in his individual capacity as Renaissance, never held himself out as doing so, and never violated the corporate form so as to warrant piercing the corporate veil to hold him personally liable. These arguments misunderstand the nature of FLSA liability, and may be rejected summarily.

Numerous Courts of Appeal have concluded that an individual corporate officer or owner may be deemed an employer under the FLSA—and therefore responsible for the corporation's FLSA obligations—in situations where the individual has overall operational control of the corporation, possesses an ownership interest in it, controls significant functions of the business, or determines the employees' salaries and makes hiring decisions. *See, e.g., United States Dep't Labor v. Cole Enters., Inc.,* 62 F.3d 775, 778 (6th Cir.1995); *Reich v. Circle C. Investments, Inc.,* 998 F.2d 324, 329 (5th Cir.1993) (no need for ownership interest to impose personal liability if individual dominates day-to-day control); *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir.1983); *see also Bonner v. Guccione,* 94 Civ. 7735(DLC), 1997 WL 362311, at *13 (S.D.N.Y. July 1, 1997) (citing cases).

Even aside from Silverman's status as president and sole shareholder of Renaissance, the record in this case manifests that he had a sufficiently dominant role in the company's daily operations as to warrant being held responsible for its FLSA obligations.

---

5. As made clear in the text below, the circumstances of this case place it within the second of the three examples set forth in the FLSA regulations. That is, while the record does not support that Renaissance and either Woo or Han ever had an arrangement to share any employees' services, or that any of these entities ever directly controlled, or was under common control with, the others, the Court's analysis of the economic realities in this case does show that Renaissance and the Paks acted "directly or indirectly in the interest of" each other "in relation to" the plaintiffs, 29 C.F.R. § 791.2(b), which of course merely manifests the Court's conclusion that both Renaissance and the Paks functioned as the plaintiffs' "employer" as that term is defined in the FLSA, *see* 29 U.S.C. § 203(d).

Indeed, Silverman's liability as an employer under the FLSA's expansive definitions is beyond question, given his admissions that he: "acted as an officer of Renaissance" in operating most aspects of the company, including marketing, designing, and sketching garments; made all of the company's business decisions; hired, fired, and set the salaries for its employees; and negotiated with its contractors. *See Bonner*, 1997 WL 362311, at *13 ("In sum, the definition of an employer within Section 203(d) does include an individual such as [the defendant] who has an ownership interest in the employing entity, dominates the day-to-day operating decisions, and makes major personnel decisions.") Consequently, to the extent that Renaissance is deemed to have been the plaintiffs' employer, the Court finds that Silverman may be held liable for the company's delinquencies in paying the plaintiffs' overtime wages, if any, not because he "did business as" Renaissance, or through any veil-piercing analysis, but simply because he was a "corporate officer who ha[d] operational control of the corporation's covered enterprise," *Cole Enters.*, 62 F.3d at 778.

█ The Paks' individual liability for the plaintiffs' overtime wages is equally clear in light of the preceding discussion. Once again, it is undisputed for present purposes that Woo and Han failed to make proper overtime payments at least to Lopez and Vargas, and there can be no argument—nor has one been made—that these two workers were not the employees of Woo and Han under the FLSA. Accordingly, the Court having entered judgment against Woo and Han, on liability only, and the record containing ample evidence that all three of the Paks exercised sufficient ownership, operational, and managerial control over Woo and/or Han

as to be responsible for those entities' FLSA obligations, the Court concludes that judgment also should be entered against each of the Paks individually as employers liable for the plaintiffs' overtime wages.[6]

### C. Renaissance's Status as an Employer Under the FLSA

The question remaining for the Court, therefore, is whether Renaissance, the manufacturer that provided the contractual production assignments on which the plaintiffs ultimately labored, may be held liable for the plaintiffs' unpaid overtime wages as their employer within the meaning of the FLSA.[7] The parties assert, and the Court's research corroborates, that this is an issue of first impression in this Circuit, at least as presented in the factual context of the garment industry and the relationship between jobbers and their production contractors. As such, the Court is unable to proceed with a proper analysis of this issue solely on the basis of extant statutes, regulations, or case law from this Circuit, but must instead look (at least in part) to other similar sources, involving analogous applications of the FLSA and other regulatory provisions, in order to establish the appropriate framework for resolving the question at hand.

#### 1. The Economic Reality Test

█ The critical focus of dispute in this case, perhaps due to the novelty of the question, concerns the preliminary issue of which test is to be applied in deciding whether Renaissance was the plaintiffs' employer under the FLSA. Both parties concur in the first instance, as they must, that the so-called "economic reality" test is used to determine employer-employee status. *See Goldberg v.*

---

**6.** As indicated, Peter Pak has been sued only in his capacity as an owner and officer of his family's businesses. Given the undisputed facts that he left Woo prior to its closing and had no ownership or operational control of Han, he may be held liable only for the FLSA obligations of Woo, and not those of Han. There is no question, however, that Lucy Pak is liable as an employer for the obligations of both Woo and Han, in light of her position as owner, chief decision-maker, and controller of daily operations for both entities. Similarly, Richard Pak may be held liable with respect to both Woo and Han, given his

generally extensive involvement with both companies, and his testimony specifically that he made at least some of the hiring decisions and kept some company records.

**7.** As noted, this litigation is stayed with respect to Renaissance pending resolution of bankruptcy proceedings involving that company. Thus, the only immediate consequence of a finding of liability against Renaissance is that Silverman, in accordance with the discussion above, will be held liable for the plaintiffs' unpaid overtime.

*Whitaker House Co–op., Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Danneskjold,* 82 F.3d at 40. This test "requires a full inquiry into the true economic reality of the employment relationship based on a particularized inquiry into the facts of each case." *Frasier v. General Elec. Co.,* 930 F.2d 1004, 1008 (2d Cir.1991) (quoting *Carter v. Dutchess Community College,* 735 F.2d 8, 13–14 (2d Cir.1984) (internal quotations omitted)).

■■■ The parties further concur on the procedural requirements for proper application of the test. For example, it is agreed that no one aspect of the relationship may be treated as dispositive; rather, "the test is based on a totality of the circumstances," so that "any relevant evidence may be considered, and mechanical application of the test is to be avoided." *Superior Care,* 840 F.2d at 1059. *Accord Frasier,* 930 F.2d at 1008. In addition, it is well settled that the goal of the analysis is to determine whether the employees in question are economically dependent upon the putative employer. Indeed, the very definition of "employees" in this context is "those who as a matter of economic reality are dependent upon the business to which they render service." *Bartels,* 332 U.S. at 130, 67 S.Ct. 1547. *See also Secretary of Labor v. Lauritzen,* 835 F.2d 1529, 1538 (7th Cir.1987) ("Economic dependence is more than just another factor. It is instead the focus of all the other considerations."); *Castillo v. Givens,* 704 F.2d 181, 190 (5th Cir. 1983) ("[t]he touchstone of 'economic reality' in analyzing a possible employee/employer relationship for purposes of the FLSA is dependency") (citation omitted). Finally, the parties' moving papers make plain that, as stated succinctly by Silverman, "[t]his case involves a claim that Mr. Silverman and/or Mr. Silverman d/b/a/ [Renaissance] was a joint employer of the plaintiffs." In other words, the parties agree that the economic reality test is to be applied in this case with an eye toward determining whether Renaissance jointly employed the plaintiffs, along with the Paks, such that it is jointly responsibility for the plaintiffs' overtime compensation.

The parties differ, however, on the substance of the economic reality test, or more precisely, which factors are to be considered in applying the economic reality test in this case. Renaissance advocates application of the four-factor test cited by the Second Circuit, *inter alia,* in *Carter,* which asks whether the alleged employer:

> (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

735 F.2d at 12 (quoting *Bonnette,* 704 F.2d at 1470) (reviewing whether prison inmate was "employed" by community college within meaning of FLSA). *Accord Danneskjold,* 82 F.3d at 40 (prison inmate case); *Rubin v. Tourneau, Inc.,* 797 F.Supp. 247, 252 (S.D.N.Y.1992) (joint employer case in which court observed that "[r]elevant factors include" the four-part *Carter* test). The plaintiffs argue that this Court should apply the more diverse and expansive test described by the Second Circuit in *Superior Care,* the factors of which include:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

840 F.2d at 1058–59 (citing, *inter alia, United States v. Silk,* 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and *Rutherford,* 331 U.S. at 730, 67 S.Ct. 1473). *See also Lauritzen,* 835 F.2d at 1535 (setting forth essentially identical test in six factors); *Donovan v. Sureway Cleaners,* 656 F.2d 1368, 1370 (9th Cir.1981) (same). The Court concludes that neither test is alone adequate or appropriate for resolving the questions presented in this case, where the parties agree that the crucial issue is whether the plaintiffs, based on an analysis of their economic dependency upon the defendants, were jointly employed by both Renaissance and the Paks.

### 2. Choosing an Appropriate Test in This Case

■ The difficulty with the tests advocated by the parties is that they are so obviously skewed, for purposes of this case, either for or against a finding that the defendants were the plaintiffs' joint employers. For example, the four-factor *Carter* test plainly focuses on the defendants' ability directly to control the plaintiffs' working conditions. Practically speaking, this means that the test will rarely permit a finding of joint employer status outside of situations involving direct corporate subsidiaries or managing administrators. Indeed, the plaintiffs in this case essentially concede that they cannot satisfy any of the express "control" factors listed in *Carter, see* 735 F.2d at 12; that is, it is undisputed that Renaissance did *not* directly: hire or fire the plaintiffs; set their rates of pay; determine their hours of work; handle the administration of their payroll; own or pay for their equipment or work space; or maintain their employment records. While the plaintiffs argue that Renaissance did directly control their working conditions through, for example, Silverman and/or his supervisors, Peter Pak and Martinez, personally showing the plaintiffs how to sew or press a garment, this supervision of the plaintiffs' work did not constitute supervision of the "conditions" of their employment, and hence cannot establish employer status under this analysis.

The five-factor *Superior Care* test, on the other hand, is to some extent equally skewed in the opposite direction. In particular, it is evident that factors two and three—the workers' opportunity for profit or loss and their investment in the business, and the degree of skill and independent initiative required of them, *see* 840 F.2d at 1058–59—are most relevant for determining whether workers are independent contractors or employees, but are of minimal value for deciding whether workers already acknowledged to be the employees of one employer should likewise be deemed the employees of a second employer. In other words, because those factors test principally for employment status in the first instance, as opposed to independence, they will almost always yield the same result for the putative second employer as for the acknowledged first employer, and thus are not sufficiently discriminating for purposes of the joint employment inquiry.[8]

The Court's task, therefore, is to identify factors that better distinguish whether workers are employed solely by one employer, or jointly by another as well.[9] An appropriate point of departure is the Supreme Court's leading joint employment case, *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). The precise question in *Rutherford* was whether

---

**8.** Here, for example, the plaintiffs made no investment in Renaissance's business, had no opportunity to profit or suffer losses from it, and performed line-production sewing and pressing jobs that required little skill or independent initiative. That these circumstances just as accurately characterize the plaintiffs' relationship with the Paks only demonstrates the limited value of factors two and three for differentiating joint employment situations from employment in general. It is undoubtedly for this reason that all of the decisions (of which this Court is aware) applying the traditional *Superior Care* factors do so in the context of determining whether workers are independent contractors or employees. *See, e.g., Superior Care,* 840 F.2d at 1058–61; *Lauritzen,* 835 F.2d at 1534–38; *Sureway Cleaners,* 656 F.2d at 1370–73. *See also Silk,* 331 U.S. at 713–19, 67 S.Ct. 1463; *Bartels,* 332 U.S. at 130–32, 67 S.Ct. 1547.

**9.** In the decision that both parties apparently agree stands as the only one addressing the issue of joint employment in the garment industry,

*Bureerong v. Uvawas,* 922 F.Supp. 1450 (C.D.Cal. 1996), the court cited and applied factors from both the *Carter* and *Superior Care* lines of cases, or at least their Ninth Circuit versions, found respectively in *Bonnette,* 704 F.2d at 1470, and *Sureway Cleaners,* 656 F.2d at 1370. *See Bureerong,* 922 F.Supp. at 1467–69. *Bureerong* was rendered in the procedural posture of a motion to dismiss, and thus the court's only concern on the relevant point was whether the complaint had sufficiently alleged an employment relationship between the plaintiffs and the manufacturer defendants, within the meaning of the FLSA, as to withstand dismissal. *See id.* at 1469. While the court considered the most important allegation in that case to have been one concerning the defendants' "control over the work plaintiffs performed," *id.,* the court also referred several times to allegations that the "workers are an integral part of the manufacturer Defendants' business," *id.* at 1468 (internal quotations omitted), allegations that plainly evoke a factor from the *Superior Care* and *Sureway Cleaners* tests. *See* 840 F.2d at 1059; 656 F.2d at 1370.

meat boners who worked on the premises of a slaughterhouse were its employees for purposes of the FLSA, where the boners had been hired and were managed by a boning supervisor who had contracted separately with the slaughterhouse to establish and direct a discrete boning operation. The contract between the slaughterhouse, the Kaiser Packing Company, and the supervisor, Reed, provided that the latter would "assemble a group of skilled boners ... who would be his employees" and over whom "he would have complete control"; that Kaiser would provide a room in its plant for the boning work; and that Kaiser employees would move the prepared carcasses into the boning room, furnish barrels for the boned meat, and remove the barrels when the boning was completed. *Id.* at 724–25, 67 S.Ct. 1473. The record revealed. that the boners owned their own tools; that Kaiser never attempted directly to control their hours; that Kaiser paid the boning supervisor (Reed and his successors) according to the weight of boned meat produced, with the boners then sharing the proceeds; and that Kaiser's president and manager made frequent visits each day to the boning room to monitor the boners' performance and productivity. *Id.* at 724–26, 67 S.Ct. 1473. Finally, it was noted that Kaiser's slaughterhouse operations, "of which the boning [was] a part, [were] carried on in a series of interdependent steps," also including slaughtering, skinning, dressing, cold storage, trimming, and weighing. *Id.* at 725–26, 67 S.Ct. 1473.

In addressing the question whether the boners were the employees of the slaughterhouse under the FLSA, the *Rutherford* Court examined the "circumstances of the whole activity," *id.* at 730, 67 S.Ct. 1473, but nonetheless made clear that certain factors were of particular importance. First and foremost, the Court emphasized that the boners "did a specialty job on the production line," *id.;* that is, their work was "a part of the integrated unit of production" at the slaughterhouse, *id.* at 729, 67 S.Ct. 1473. On this point the Court specifically agreed with the assessment of the circuit court below, which had remarked, *inter alia,* that

> [t]he operations at the slaughterhouse constitute an integrated economic unit devoted

primarily to the production of boneless beef. . . . The task of [both the boners and the admitted plant employees] is performed in its natural order as a contribution to the accomplishment of a common objective.

*Id.* at 726, 67 S.Ct. 1473 (citation omitted). The other factors cited by the Court included, second, that responsibility under the boning contracts passed from one chief boner to another "without material changes"; third, that Kaiser's premises and equipment were used for the work; fourth, that the group of boners "had no business organization that could or did shift as a unit from one slaughterhouse to another"; and fifth, that the managing official of the slaughterhouse "kept close touch" on the boning operation. *Id.* at 730, 67 S.Ct. 1473. While the Court also applied a factor distinguishing the boners from independent contractors—that they essentially performed piecework requiring no independent initiative or judgment—it was undisputed, as indicated above, that the boners were by contract the employees of the boning supervisor, Reed (and later others), who hired and managed them. Thus the Court's analysis plainly arose in the context of an ostensible joint employment relationship, and the factors that the Court invoked to resolve the case were manifestly suited to that context. After reviewing the relevant factors, the Court concluded that the boners were the employees of the slaughterhouse for purposes of the FLSA. *Id.* at 730, 67 S.Ct. 1473.

Two of the factors identified in *Rutherford* are directly mirrored in factors one and five of the *Superior Care* test. Specifically, the *Rutherford* Court's observation that the slaughterhouse manager kept "close touch" on the boners' work through frequent monitoring of their performance, 331 U.S. at 730, 726, 67 S.Ct. 1473, corresponds to the *Superior Care* factor addressing the "degree of control exercised by the employer over the workers," 840 F.2d at 1058. In addition, the notion in *Rutherford* that the boners performed a "specialty job on the production line," as part of a larger "integrated unit of production" directed toward Kaiser's objective of producing boneless beef, 331 U.S. at

726, 729, 730, 67 S.Ct. 1473, is captured by the *Superior Care* factor examining the "extent to which the work is an integral part of the employer's business," 840 F.2d at 1059. While some courts analyze these concerns in two separate factors, *see, e.g., Torres–Lopez,* 111 F.3d at 640, 643–44 (individually addressing whether the work was a "specialty job on the production line" and whether the work was "an integral part of the alleged employer's business") (citations omitted), the Court finds that the terms in reality measure the same concept: whether the workers performed a discrete task comprising one important aspect of the putative employer's overall production process or business objective. *See, e.g., Antenor v. D & S Farms,* 88 F.3d 925, 937 (11th Cir.1996) (analyzing whether farmworkers performed "a line-job integral to the harvesting and production of salable vegetables") (citation omitted). At minimum, therefore, the first and fifth *Superior Care* factors, examining the putative employer's control over the workers and the importance of their specific function to his enterprise, should be part of any economic reality test seeking to determine joint employment.

Three other factors noted in *Rutherford* are not expressly included in *Superior Care* or *Carter,* but nonetheless are also helpful measures of joint employment and should be considered by the Court here. The first of these, whether responsibility under the contract with the putative joint employer passed "without material changes" from one group of potential joint employees to another, bears on whether the putative employer's contractors had a genuine opportunity to bargain for their labor, or whether the contracts were form arrangements permitting little negotiation, such that essentially any economically dependent group of workers could be brought in to replace a prior group performing identical work. *See Torres–Lopez,* 111 F.3d at 643 (contracts between land owners and farm-labor contractors were standard for the industry and involved little negotiation). Similarly, whether the joint employer's premises and equipment were used for the work is plainly a significant indicator of the workers' economic dependence on the putative joint employer. *Id.* at 643–44. And lastly, whether the workers had a "business

organization" capable of shifting as a unit from one putative joint employer to another, relates to the workers' ability to contract effectively for the provision of their services as employees of an independent entity, or their lack of such an organization and resultant dependency on the putative employer for obtaining work ad hoc. *See id.* at 644. Because all of these factors help decide the joint employment issue, they should be included in the Court's test in this case.

One factor not addressed in *Rutherford,* but included in the *Superior Care* test, examines the permanence or duration of the working relationship. *See* 840 F.2d at 1059. Although this factor is regularly applied to distinguish independent contractors from employees, *see, e.g., Lauritzen,* 835 F.2d at 1537, its relevance is not restricted to independent contractor cases alone. Indeed, many admitted employees of independent firms, who could not be considered joint employees of a second putative employer, would likely have no longstanding or regular working relationship with the second employer. In this respect, the permanence and duration of the workers' relationship with the putative employer, unlike the workers' opportunity for profit or loss or the degree of skill and initiative required of them, is a factor that does effectively differentiate between employees generally and those who may be deemed joint employees. For that reason, the factor is analyzed in joint employer cases, *see, e.g., Torres–Lopez,* 111 F.3d at 640, 644, and should be included in this Court's test.

A final factor that the Court concludes it should analyze is the extent to which the subject employees' work was performed exclusively or predominantly for the putative joint employer. Although not described in any decision of which this Court is aware as a separate factor for consideration, the extent of work performed for the joint employer is implicitly a factor in virtually every joint employment case. In *Rutherford,* for example, there was no question that Reed's crew of meat boners worked exclusively on Kaiser's production of boned beef, *see* 331 U.S. at 724–25, 67 S.Ct. 1473; and in the farm-labor cases, there is no debate that the putative employees work exclusively on the culti-

vation and harvesting jobs of the land-owner to whose farm they have been assigned by the labor contractor, *see Torres–Lopez,* 111 F.3d at 637; *Antenor,* 88 F.3d at 927. Thus, the extent to which the employees at issue work exclusively for the putative joint employer, as opposed to other potential employers or even their nominal principal employer, is highly probative of their economic dependence on the putative employer. The Court will therefore add this factor to its economic reality test.

As is evident from the preceding discussion, the Court relies in part on decisions rendered in the farm-labor context, like *Torres–Lopez* and *Antenor,* to select the appropriate factors for analysis here. Silverman, however, disputes the applicability of farm-labor cases on the ground that they are governed explicitly by the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801 *et seq.* The Court nevertheless concludes that the existence of that statutory scheme in no way precludes use of pertinent principles from the farm cases.

The AWPA was enacted in 1983 as an amendment to the FLSA specifically addressed to the problems and abuses faced by migrant and seasonal farm laborers. *See, e.g., Torres–Lopez,* 111 F.3d at 639; *Antenor,* 88 F.3d at 929. The statute expressly provides that the term "employ" has the same meaning under that statute as under the FLSA: "to suffer or permit to work." *See* 29 U.S.C. § 1802(5); 29 U.S.C. § 203(g); *Torres–Lopez,* 111 F.3d at 639; *Antenor,* 88 F.3d at 929. As discussed above, it is this broad definition of "employ" that fundamentally determines the expansive treatment of employer/employee relationships under the FLSA, *see Nationwide,* 503 U.S. at 326, 112 S.Ct. 1344; *Rutherford,* 331 U.S. at 728, 67 S.Ct. 1473; *Rosenwasser,* 323 U.S. at 363 n. 3, 65 S.Ct. 295, thus indicating that the same expansive treatment is appropriate under the AWPA. In addition, the regulations implementing the AWPA provide that "joint employment" under that Act is "joint employment" under the FLSA. *Torres–Lopez,* 111 F.3d at 639 (quoting 29 C.F.R. § 500.20(h)(4)). Indeed, the AWPA's incorporation of the FLSA definition of employment was done with the deliberate intention of "adopting the 'joint employer' doctrine as a central foundation of" the AWPA's statutory scheme. *Antenor,* 88 F.3d at 930 (citation omitted). Thus the focus of many farm-labor cases is the same as that of "joint employment" cases under the FLSA: "whether the [workers], notwithstanding any employment relationship with the contractor, were economically dependent on, and therefore jointly employed by, the growers [or manufacturers] under the FLSA and AWPA." *Id.* at 933.

The farm-labor analogy is compelling in this case for all of the reasons indicated above relating to the common purposes and applications of the AWPA and FLSA, but particularly because of the attention paid in AWPA cases to the economic dependence of workers on their putative employers. Simply put, the dynamic between unskilled workers performing a discrete aspect of production, middle-man contractors, and dominant, relationship-defining owners is highly similar whether those owners are farmer-growers or manufacturer-jobbers; in either case, a joint employment relationship exists if the workers are shown to be economically dependent on the putative employer pursuant to an economic realities test.

In *Torres–Lopez,* for example, the Ninth Circuit held that a corporate farm group was the joint employer of farm workers who had been hired to pick the farms' cucumber crop by an independent farm-labor contractor. *See* 111 F.3d at 645. In reaching this conclusion, the court first applied the five regulatory factors promulgated under the AWPA for purposes of identifying joint employment relationships:

(A) The nature and degree of control of the workers;

(B) The degree of supervision, direct or indirect, of the work;

(C) The power to determine the pay rates or the methods of payment of the workers;

(D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; [and]

(E) Preparation of payroll and the payment of wages.

*Id.* at 639–40 (quoting 29 C.F.R. § 500.20(h)(4)(ii)). Based on the express admonition in the AWPA regulations that this list of factors is not exhaustive, *id.* at 640, the *Torres–Lopez* court then applied eight non-regulatory factors, drawn from cases cited in the regulations: (1) whether the work was a specialty job on the production line; (2) whether responsibility under the putative employees' contracts passed from one labor contractor to another without material changes; (3) whether the putative employer's premises and equipment were used for the work; (4) whether the employees had a business organization that could or did shift as a unit form one worksite to another; (5) whether the work was piecework not requiring initiative, judgment, or foresight; (6) whether the employee had an opportunity for profit or loss depending upon his own skill; (7) whether there was permanence in the working relationship; and (8) whether the service rendered was an integral part of the putative employer's business. *Id.*

In assessing the factors applied in *Torres–Lopez,* it is evident that the first of the five regulatory factors is nearly identical to factor one of the *Superior Care* test, "the degree of control exercised by the employer over the workers," 840 F.2d at 1058; conversely, the latter four regulatory factors closely resemble, and at times repeat verbatim, the factors of the *Carter* "control" test, *see* 735 F.2d at 12. The Court finds that the latter four "control" factors, notwithstanding their inclusion in the AWPA regulations, are of little assistance in deciding joint employment issues, for reasons stated above. Indeed, these factors were apparently accorded minimal weight in *Torres–Lopez,* inasmuch as the court found that a joint employment relationship existed in that case despite the facts that the labor contractor there evidently had sole responsibility for, *inter alia,* hiring and firing workers; ensuring that working conditions met state and federal law; setting the amount, rate, and timing of the workers' payments; and preparing and maintaining the workers' payroll records. *See* 111 F.3d at 637 n. 3.[10] Excepting the factor addressed to the putative employer's degree of control over the workers, the Court concludes that the AWPA regulatory factors, merely replicating the *Carter* control factors, should weigh little, if anything, in the ultimate joint employment determination.

The non-regulatory factors applied in *Torres–Lopez* encompass essentially all of the factors identified in *Rutherford,* plus the "permanence of relationship" factor found in *Superior Care* and other cases. As already explained, the Court finds the questions regarding the workers' opportunity for profit or loss, and whether their work required initiative and judgment, to be largely unhelpful for distinguishing joint employment from employment generally; accordingly, those factors will play no part in the Court's analysis here. All of the other non-regulatory factors applied in *Torres–Lopez,* however, are effective indicia of joint employment relationships, and capable of differentiating that circumstance from employment in the first instance.

In sum, based on the case law and regulations in the field, including those under a closely related statutory scheme, the Court concludes that the following factors are the ones most relevant to and indicative of a joint employment relationship. These are the factors that the Court will analyze to determine if Renaissance was the plaintiffs' joint employer:

(1) the extent to which the workers perform a discrete line-job forming an integral part of the putative joint employer's integrated process of production or overall business objective;

(2) whether the putative joint employer's premises and equipment were used for the work;

(3) the extent of the putative employees' work for the putative joint employer;

10. The Ninth Circuit's reasoning on this point was based in part on the district court's failure to appreciate that the AWPA regulations—in contrast to pure "control" tests such as *Carter*—provide that *"indirect control* as well as direct control can demonstrate a joint employment relationship." 111 F.3d at 643 (emphasis added). *See* 29 C.F.R. § 500.20(h)(4)(ii) ("The degree of supervision, direct or indirect, of the work.").

(4) the permanence or duration of the working relationship between the workers and the putative joint employer;

(5) the degree of control exercised by the putative joint employer over the workers;

(6) whether responsibility under the contract with the putative joint employer passed "without material changes" from one group of potential joint employees to another; and

(7) whether the workers had a "business organization" that could or did shift as a unit from one putative joint employer to another.

Although the other factors described in *Carter* and *Superior Care* may provide guidance in a given case, they are less generally applicable than the seven factors listed above for purposes of analyzing the existence of a joint employment relationship.

### 3. *Application of the Economic Reality Test in This Case*

■ Once again, the precise question in applying the economic reality test here is whether, in addition to the Paks, the plaintiffs were likewise jointly dependent for their employment upon Renaissance, for any period of time. *See Antenor*, 88 F.3d at 932 ("[T]he question in 'joint employment' cases is not whether the worker is more economically dependent on the independent contractor or the [manufacturer], with the winner avoiding responsibility as an employer."). The Court will address the prescribed factors in turn, as well as any additional factors deemed relevant, in keeping with the parties' agreement that the economic reality test requires consideration of the totality of the circumstances, based on an examination of all the pertinent facts of the case. In every instance, "the weight of each factor depends on the light it sheds on the [ ]workers' economic dependence (or lack thereof) on the alleged employer." *Id.*

(1) *Extent to which the work is a discrete line-job forming an integral part of the joint employer's integrated process of production*

This initial factor favors a finding of joint employment perhaps most of all. There can be no question that the Paks' production work was vital to Renaissance's business; Renaissance depended entirely on outside sewing contractors to perform this aspect of its operations, and there is no dispute that the Paks acted as that key contractor for varying (and occasionally quite large) portions of that sewing work. Indeed, on this record, practically speaking, the Paks functioned for certain periods essentially as Renaissance's own sewing and pressing unit, merely located a few blocks away from the main plant. Thus, given the limited skill their work required, the Paks' employees "performed a routine line-job integral to [Renaissance's] business," and—along with other contractors performing different discrete tasks essential to the manufacturing process—"were but one part of an 'integrated economic unit' operated by [Renaissance]." *Id.* These facts are "probative of joint employment" inasmuch as "a worker who performs a routine task that is a normal and integral phase of the [employer's] production is likely to be dependent on the [employer's] overall production process." *Antenor*, 88 F.3d at 937.

(2) *Whether the joint employer's premises and equipment were used for the work*

It is undisputed that the Paks' employees performed all of the sewing and pressing work at issue on the Paks' separate factory premises, with the Paks' equipment. Furthermore, it is clear that Renaissance did not assist Woo or Han with the rent for their factory space or with the rental or purchase of equipment. Nevertheless, while suggesting that Renaissance was not the plaintiffs' employer, these circumstances carry limited weight in the context of the work performed here. First, Renaissance sent its sewing and assembly work to an outside shop just a few blocks away in Manhattan. Second, Renaissance supplied all of the critical components that the Paks' workers needed to perform their tasks, namely, the fabric, trimmings, and other raw materials to be cut, sewed, and eventually assembled into finished clothing. Where these processes take place is far less important in this context than who owns and supplies the vital materials, given that

the materials are portable and their location is not necessarily coincident with ownership. For these reasons, the plaintiffs' performance of their work on the Paks' premises weighs little against a finding of joint employment by Renaissance.

### (3) Extent to which the employees' work is performed for the putative employer

While the Paks contracted with Renaissance throughout the time period at issue in this case, it is evident that the Paks became particularly dependent on Renaissance after Peter Pak left to become Silverman's production manager. As discussed above, it is undisputed that 75 percent of Renaissance's business was performed by Han, and that a full 85 to 95 percent of Han's work was performed for Renaissance (with perhaps a floor of 80 percent and a ceiling approaching 100 percent). These figures demonstrate unequivocally that the Paks, at least during the roughly six-month period that they operated Han, were in fact dependent on Renaissance. While Renaissance argues that it should not be penalized for Lucy Pak's decision to tie her company's fortunes so exclusively to Renaissance, the reasons giving rise to that circumstance are largely irrelevant. Purely as a factual matter, it is undeniable that Han depended nearly entirely on Renaissance for the very existence of work, for the materials with which to perform work, for the instructions and criteria under which to complete work, and for the standards with which finished work was expected to comply. Consequently, it also is evident that the Paks' workers were as much dependent on Renaissance for these aspects of their employment as they were on Han, and as Han was on Renaissance. These circumstances plainly indicate that the plaintiffs were jointly employed by both entities.

### (4) Permanence or duration of the working relationship with the putative joint employer

For purposes of this factor, what matters is not the length of any particular period of employment, but the regularity of the relationship. See, e.g., Lauritzen, 835 F.2d at 1537 (even temporary seasonal employment has permanency for the duration of the season, especially where workers return year after year to same employer). Here, it is established that Renaissance contracted on a consistent basis with both Woo and Han, with the latter relationship becoming so extensive and regular as to approach one of exclusive agency. Thus, the Paks' workers, particularly during Han's existence, regularly performed significant portions of their work on production assignments for Renaissance. The plaintiffs' steady—and at times virtually uninterrupted—working relationship with Renaissance indicates that they were dependent on Renaissance for their employment.

### (5) Joint employer's degree of control over workers

As indicated above, the plaintiffs essentially concede that Renaissance exercised no direct control over the conditions of employment at either Woo or Han, inasmuch as Renaissance did not hire or fire the Paks' workers, set their hours or rates of pay, or handle their payroll or employment records. The Court agrees, however, that Renaissance did exercise significant control over the plaintiffs through other means. For example, Renaissance directly monitored the quality of its garments as produced by the Paks. Whether through Silverman or production managers such as Peter Pak, who visited Han "no less than three days" per week, Renaissance conducted frequent quality control inspections at the Paks' factory, thereby dictating the standards that the Paks' employees were required to meet in performing their work, and supervising their performance to ensure that those standards were met. See Antenor, 88 F.3d at 934–35 (joint employment indicated by growers' supervision over farmworkers, including daily quality control inspections in fields by growers' representatives). Furthermore, Renaissance's supervision over the quality of the finished products, combined with its practice (noted above) of supplying virtually all of the materials that the Paks' employees needed for their assignments, meant that Renaissance, and not the Paks, controlled the substance of the plaintiffs' daily work—both physically and procedurally—from a project's beginning until end. In these respects, the plaintiffs were dependent on Renaissance for significant aspects of their employment.

**(6)** *Whether responsibility under the contract with the putative joint employer passed "without material changes" between potential joint employees*

This factor also favors a finding of joint employment insofar as Renaissance dealt interchangeably with multiple contractors for the performance of different aspects of its production process. As explained above, the Paks had minimal power to negotiate different terms with Renaissance; indeed, Silverman eventually forced all of his contractors to sign written form agreements. *See Torres–Lopez,* 111 F.3d at 643. The result is that the Paks could be replaced by other similarly situated contractors at Renaissance's whim, which is precisely what happened when Renaissance stopped dealing with Han in June 1996, forcing Han to close. Along these lines, there was no material change in the relationship between the Paks' employees and Renaissance when Woo went out of business approximately six months earlier (for reasons not made clear in the record), and Han commenced operations in place of Woo, contracting on precisely the same sewing projects as Woo, and altering only the frequency with which it entered into those arrangements with Renaissance.

**(7)** *Whether the workers had a "business organization" capable of shifting as a unit between employers*

This factor, however, plainly favors the defendants. Woo and Han form precisely the type of independent "business organization" that could and did market its workers' services to multiple jobber-employers. Although the Paks' contracted almost exclusively with Renaissance at times, their workers at least were not forced to fend for themselves in seeking employment. *Cf. Torres–Lopez,* 111 F.3d at 644 (farmworkers learned by word of mouth that crops were ready for picking, found way to fields on own, and were selected by labor contractor from pool of arrivals).

**(8)** *Additional factors*

The Court notes two further, closely related aspects of this case, wholly specific to this record, that it finds particularly relevant to the analysis of whether Renaissance was the plaintiffs' joint employer. The first issue concerns the role of Peter Pak, and his relationship with his family's business after he began working at Renaissance. Peter, as an owner and principal of Woo, clearly knew his family's business intimately, and when he started at Renaissance he admittedly used that familiarity to increase the working relationship between his new company and his family's businesses. The magnitude of that relationship has been addressed above, but for present purposes, Peter's ascension to the production manager's job makes it even more obvious that Renaissance and the Paks' companies functioned at times as an integrated economic unit, and thus as joint employers of the plaintiffs.

For example, when Peter negotiated contract rates with Han, he did so as intermediary between Renaissance and his own mother, and on "some occasions" his mother accepted production contracts from Renaissance at prices with which she was not happy in order to "maintain a good relationship" between the firms. Also, when Peter communicated directly to Han's workers, during his frequent on-site visits, that they were performing some aspect of Renaissance's production job incorrectly, he generally was speaking to workers—including at the very least the plaintiffs—who had been under his direct supervision at Woo only a few months earlier. And when Peter found that garments produced by Han failed to meet Renaissance's specifications, he would tell his mother, who would "fix the problem" by showing Han's workers how to make garments match the specifications accurately.

Secondly, along these same lines, it is conceded that when the Paks did produce nonconforming garments, Renaissance still did not reduce the amounts of its originally scheduled payments to the Paks for those garments. Far from indicating that Renaissance "did not dominate [Han]," as the defendants argue, this "acceptance of sub-standard work" shows that Renaissance suffered the losses for any unsatisfactory merchandise (produced by the Paks) that it sold. Absorbing such losses is customary for manufacturers that produce their own goods in-house. But had Renaissance and the Paks been tru-

ly independent of one another here, Renaissance would surely have charged the Paks for each and every mistake in production, by deducting from the amount of their contractual payments.

Considered together, these circumstances make transparent the symbiosis between Renaissance and the Paks' companies. At least for certain periods, Renaissance treated Woo and Han simply as production arms of its overall garment manufacturing enterprise, relying on intimate family connections to conduct business and enforce quality control standards, and shouldering the losses for any production errors that their workers made. These are indicia of a joint employment relationship.

### (9) Analysis of all factors

Based on the preceding analysis of the economic reality factors, the Court concludes that Renaissance was the plaintiffs' employer within the meaning of the FLSA, at least during the period in which they worked for Han. While the plaintiffs were economically dependent on Han insofar as they were hired, paid, supervised, and given their work assignments and hours directly by Han, many aspects of the plaintiffs' work, as explained above, were structured and controlled either directly or indirectly by Renaissance. *See Antenor*, 88 F.3d at 938. Again, the object of the economic reality test in the joint employment context is not to determine whether the workers at issue are *"more* economically dependent on the independent contractor or the [manufacturer]," *id.* at 932 (emphasis added), but whether the "totality of the evidence ... demonstrates the economic dependence of the [workers] on *both*" of those employers, *id.* at 938 (emphasis added). The record establishes that the plaintiffs, as employees of the Paks, were economically dependent on both Han and Renaissance, and therefore that the plaintiffs were jointly employed by both entities. *See id.; Torres–Lopez*, 111 F.3d at 644. Accordingly, having already entered judgment against Han on liability, and determined that the Paks are liable individually as the plaintiffs' employers, the Court likewise finds that Renaissance was the plaintiffs' joint employer under the FLSA for the period during which they worked at Han, and therefore that Silverman is liable along with Han for the unpaid overtime wages that the plaintiffs are owed.

■ Whether Silverman also is liable as the plaintiffs' employer for the time they worked at Woo is a closer question. Two considerations in particular persuade the Court that it cannot enter judgment as a matter of law on this point. First, in regard to factors five and eight addressed above, the evidence shows that Peter Pak worked at Woo for most of its existence, and became production manager at Renaissance only at the end of that period. While it is undisputed that he had extensive interaction at *Han* as a representative of Renaissance, the record is unclear as to the extent of his activities at *Woo* in that capacity. Peter Pak's predecessor as production manager, Martinez, did apparently visit Woo fairly frequently as well, but there is insufficient evidence as to his precise activities on those visits to determine the type of supervision and indirect control he may have exerted over the plaintiffs' work at Woo as the representative of Renaissance. The record is therefore fragmentary regarding important indicia of Renaissance's power and influence over Woo, and accordingly, whether Woo's workers were economically dependent on, and thus jointly employed by, Renaissance.

Second, with respect to factor three, the parties flatly dispute the extent of work that Woo performed for Renaissance, both for the bulk of Woo's existence, and for the period after Peter Pak left to work at Renaissance. Although deposition testimony indicates that the percentage was low, the plaintiffs cite evidence indicating that Woo may have performed a much higher proportion of its work for Renaissance during certain periods, such as the one following Peter Pak's move. While the extent of work performed for a putative employer is only one factor in this analysis, it was an important consideration in the Court's finding that Han was economically dependent on Renaissance. The lack of similar information here impedes the Court's ability to make a judgment as a matter of law with respect to the dependence of the Paks' workers on Renaissance during the time they

**424**

were employed by Woo. For both of these reasons, the Court finds that disputed issues of fact preclude summary judgment for either side on the issue of liability for the plaintiffs' unpaid overtime wages at Woo.

## CONCLUSION

For the reasons set forth above, the Court finds that defendants Richard and Lucy Pak are individually liable for all of the overtime payments owed to plaintiffs Jose Lopez and Rufina Herrera Vargas with respect to their employment at both Woo and Han. Defendant Peter Pak is likewise liable for the overtime wages owed to Lopez and Vargas for the time that they worked at Woo, prior to his departure from that firm. For the reasons stated, the Court finds that Renaissance is liable for the unpaid overtime wages of Lopez and Vargas for the period during which they worked at Han, and that Silverman is in turn individually liable for the FLSA obligations of Renaissance. Nevertheless, the Court finds that the plaintiffs have failed to adduce sufficient competent evidence to establish that any overtime wages are owed to plaintiff Arturo Flores.

Accordingly, Silverman's motion for summary judgment is granted as to Flores, and denied in all other respects. The plaintiffs' motion for summary judgment with respect to Lopez and Vargas is granted against Silverman as to the time that Lopez and Vargas worked at Han; granted against Richard and Lucy Pak as to the time that Lopez and Vargas worked at both Woo and Han; and granted against Peter Pak as to the time that Lopez and Vargas worked at Woo (prior to Peter Pak's departure from Woo). The plaintiffs' motion for summary judgment is denied in all other respects, and in particular is denied with regard to Flores. The further conduct of pretrial proceedings in this case shall be governed by the pretrial scheduling order issued simultaneously herewith.

SO ORDERED: