Faty ANSOUMANA, Jacques Legrand Ngouvi, Lassana Diarra, Moussa Soumahoro, Mamadou Camara, Justin Obiang, Issa Diabate, Sidy Soukona, Dramane Zoungrana, Individually, and on behalf of all others similarly situated as Class Representatives, Plaintiffs,

v.

GRISTEDE'S OPERATING CORP.; Great Atlantic and Pacific Tea Company, Inc., d/b/a A & P; Shopwell, Inc., d/b/a Food Emporium; Duane Reade, Inc.; Charlie Baur, individually, and d/b/a B & B Delivery Service a/k/a Citi Express; Scott Weinstein and Steven Pilavin, individually and d/b/a Hudson Delivery Service, Inc.; Chelsea Trucking, Inc., a/k/a Hudson York, Defendants.

No. 00 Civ. 253(AKH).

United States District Court,
S.D. New York.

Jan. 28, 2003.

National Employment Law Project, Catherine Ruckelshaus, Palyn Hung, New York, New York; Outten & Golden, Adam Klein, Scott Moss, New York, New York; Office of the New York Attorney General, Jennifer Brand, Mary Hughes, New York, New York, for Plaintiffs.

Putney, Twombly, Hall & Hirson, James E. McGrath III, Larissa A. Cason, New York, New York, for Defendants Duane Reade, Inc.; Milman & Heidecker, Perry Heidecker, Lake Success, New York, for Defendants Scott Weinstein, Steven Pilavin, Hudson Delivery Service, Inc. & Chelsea Trucking, Inc.

### OPINION AND ORDER GRANTING PLAINTIFFS PARTIAL SUMMARY JUDGMENT

HELLERSTEIN, District Judge.

Plaintiffs Faty Ansoumana et al., and the class they represent, were delivery workers for supermarkets and drugstore chains, including stores owned and operated by Duane Reade, Inc., a defendant. The delivery workers were hired by the Hudson/Chelsea group of defendants [1] and

1. The group is made up of Scott Weinstein, Steven Pilavin, Hudson Delivery Service, Inc., and Chelsea Trucking, Inc. Hudson Delivery Service, Inc. is owned and operated by Weinstein, and Chelsea Trucking, Inc. is owned and operated by Pilavin, Weinstein's brother-

assigned to Duane Reade stores to make deliveries to customers and to provide general in-store services, as directed by the store supervisors. I am asked to decide, on these cross-motions for summary judgment, whether, as to the Hudson/Chelsea defendants, the plaintiffs were independent contractors or employees entitled to be paid a minimum wage and time-and-a-half for overtime and, if plaintiffs were employees, whether Duane Reade was a "joint employer," jointly obligated with the Hudson/Chelsea defendants to pay minimum wages and overtime. I will be applying, in determining the issues put to me, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219 (2002), and the New York Minimum Wage Act, N.Y. Lab. Law §§ 650–665 (2002).

The defendant, Duane Reade, Inc. is a large retail drugstore chain in the New York metropolitan area. Duane Reade outsourced its requirements for delivery workers by engaging the Hudson/Chelsea defendants to provide delivery workers to the Duane Reade stores, at the rate of $250 to $300 per week, per worker. The Hudson/Chelsea defendants, in turn, paid the delivery workers whom they assigned $20–$30 per day, characterizing them as independent contractors in order to avoid the minimum wage and overtime provisions of federal and New York law.

I hold in this decision that those delivery workers who were assigned to work in Duane Reade stores and made deliveries on foot were not independent contractors, that the Hudson/Chelsea defendants are liable to them for violations of the FLSA and the New York Labor law, and that Duane Reade and the Hudson/Chelsea defendants were joint employers within the meaning of those laws and were jointly and severally obligated to pay minimum wages and overtime to the delivery workers.

The record shows that besides those delivery workers who were assigned to work at or in a Duane Reade store and made their deliveries mainly by foot, Duane Reade also used other types of delivery services including: beeper service, where a delivery person would be called by beeper to a Duane Reade store to pick up a delivery; van service, where delivery workers would make deliveries using vans which either they owned or were supplied by the Hudson/Chelsea defendants; and a shared service, where a Duane Reade store utilized the labor of a delivery worker who was assigned to more than one Duane Reade store or to another retailer. The record with respect to the delivery workers who delivered by these methods was not well-developed. Accordingly, I make no decision with respect to these workers pending further discovery, and defer ruling as to them on the pending motions for summary judgment. The instant grant of partial summary judgment against Duane Reade therefore encompasses only those delivery workers who were assigned to work at or in a Duane Reade store and made their deliveries mainly by foot.

In addition, the record is not well-developed in regard to plaintiffs who were hired by the Hudson/Chelsea defendants and were assigned to other supermarket chains that are not defendants in this lawsuit. Thus, I also defer ruling with respect to this latter group of plaintiffs, pending further discovery. The motion for summary judgment against the Hudson/Chelsea defendants therefore is granted only with respect to those delivery workers who were assigned to Duane Reade.

Finally, although plaintiffs have moved for summary judgment against the Hudson/Chelsea defendants and Duane Reade for the entire class period, I believe that

---

in-law. The opinion will refer to these defen-      dants as "the Hudson/Chelsea defendants."

the evidence on the instant motions is not sufficient to allow summary judgment to be granted with respect to the period after March 26, 2000, the effective date of a collective bargaining agreement signed by the Hudson/Chelsea defendants and plaintiffs. A ruling on plaintiffs' claims after the March 26, 2000 date will be deferred pending further discovery and more complete briefing. Thus, summary judgment against Duane Reade and the Hudson/Chelsea defendants is granted only through March 26, 2000.

## I. *Background*

Plaintiffs filed this action on January 13, 2000 against three large chains of New York supermarkets and drugstores, and several companies and individuals who hired employees to work as deliverymen in such chains. Plaintiffs alleged that the defendants were operating in violation of the FLSA and the New York Minimum Wage Law. They claimed that the defendants, who had hired the delivery workers, and the chains to which they were assigned and in which they worked were jointly and severally liable to them. In May 2001, I certified a class of delivery workers and dispatchers who had worked for defendants between January 13, 1994 and May 24, 2001 and who had not been paid the minimum wage or overtime required under New York law. More than 500 delivery workers have filed consents and are participating in this lawsuit pursuant to the collective action provisions of the FLSA. 29 U.S.C. § 216(b).

The delivery workers involved in the motion before me were hired by the Hudson/Chelsea defendants and were assigned to and worked for Duane Reade stores in Manhattan. The workers are mainly unskilled immigrants, mostly from West Africa. They provided services in the stores and made deliveries from the stores, and, despite working eight to eleven hours a day, six days a week, were paid a flat rate of between $20–$30 per day, well below minimum wage requirements.

The record developed in discovery shows that the Hudson/Chelsea defendants hired the delivery workers for 45 to 60 of the 200 Duane Reade stores located in Manhattan and the boroughs. By oral agreement between Duane Reade and the Hudson/Chelsea defendants, Duane Reade has depended on the Hudson/Chelsea defendants exclusively, since 1994, to supply its stores with delivery workers and has been paying the Hudson/Chelsea defendants a flat weekly rate of $250–$300 per worker. The Hudson/Chelsea defendants hired their workers essentially without advertising, from recommendations by one worker to another, and provided them with uniforms and delivery carts. Since 1989, the Hudson/Chelsea defendants have regarded their delivery workers as independent contractors, not employees, and have required some of the workers to sign statements so acknowledging. The Hudson/Chelsea defendants have not withheld federal, state, or local taxes, nor made FICA or other statutory required withholdings from the payments to the workers, and have given them IRS Forms 1099 rather than W–2s to reflect their compensation. The Hudson/Chelsea defendants did not maintain a system for tracking the delivery workers' hours or pay and did not keep records of any tips the delivery workers received.

In March 2000, the Hudson/Chelsea defendants entered into a collective bargaining agreement with those of its delivery workers who had joined Local 338, Retail, Wholesale and Department Store Workers Union, AFL–CIO. That agreement required that all employees hired by the Hudson/Chelsea defendants earn at least $5.15 an hour and time and a half for overtime. Employees assigned to drug stores are allowed $1.65 of the wage to be

credited as tip allowance. Since the agreement was signed, the Hudson/Chelsea defendants have been issuing IRS Forms W-2 to their delivery workers.

The delivery workers assigned to Duane Reade stores reported to the Duane Reade store to which they had been assigned and received directions from Duane Reade personnel in that store. Generally, they were assigned to the pharmacy departments and made deliveries of pharmaceutical items to customers. Duane Reade personnel provided the pharmaceutical stickers, issued the delivery instructions and, if payment was to be collected, instructed the delivery workers how much money to bring back from the customer. The Duane Reade stores maintained logs at the stores, and the delivery workers signed in and out of the logs upon each delivery, recording deliveries and receipts. In their spare time, the delivery workers were often asked to help customers with heavy items, provided bagging services at check-out registers, helped with security, stocked shelves, and moved products from one Duane Reade store to another. If a delivery worker was unsatisfactory, the Duane Reade manager asked Hudson/Chelsea to reassign the worker and provide another to replace him. Thus, the delivery worker, although not hired or paid by Duane Reade, was directed by Duane Reade managers and supervisors and provided services essentially similar to other Duane Reade employees.

## II. *Legal Framework*

### A. The Fair Labor Standards Act

The Fair Labor Standards Act mandates that "employees" receive a minimum wage and overtime pay of time and a half of the workers' regular hourly rate for each hour worked in excess of forty hours per workweek.[2] 29 U.S.C. §§ 206(a)(1), 207(a)(1) (2002). The FLSA defines an "employee," with certain exceptions not relevant here, as "any individual employed by an employer." *Id.* § 203(e)(1). The statute in turn defines "employ" as "to suffer or permit to work," *id.* § 203(g), and "employer" to include "any person acting directly or indirectly in the interest of an employer." *Id.* § 203(d). The terms are to be expansively defined, with "striking breadth," in such a way as to "stretch ... the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). As the Second Circuit has ruled, the FLSA, in accordance with its remedial purpose, has been written in the "broadest possible terms," *Carter v. Dutchess Cmty. Coll.,* 735 F.2d 8, 12 (2d Cir.1984), and is to be construed broadly, for it would run "counter to the breadth of the statute and to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over a worker ... to escape compliance with the Act." *Id.; see also Frankel v. Bally, Inc.,* 987 F.2d 86, 89 (2d Cir.1993) (noting "the expansive nature of the FLSA's definitional scope"); *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1058 (2d Cir.1988) (noting that the definition of "employ" is "necessarily a broad one in accordance with the remedial purpose of the Act").

The regulations implementing the FLSA contemplate that an employee may have more than one employer. 29 C.F.R. § 791.2(a) ("a single individual may stand in the relation of an employee to two or more employers at the same time" under

---

**2.** During the class period, January 13, 1994 to May 24, 2001, the minimum wage was $4.25 until September 30, 1996, $4.75 between October 1, 1996 and August 31, 1997, and $5.15 thereafter. 29 U.S.C. § 206(a)(1).

the FLSA). Such "joint employment" arises when the employee "performs work which simultaneously benefits two or more employers" and "one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee." 29 C.F.R. § 791.2(b). This question of joint employment of plaintiffs, by Duane Reade and by the Hudson/Chelsea defendants, is a central issue in these cross motions.

### B. New York Law

The New York Minimum Wage Act, like the FLSA, requires employers to pay a minimum wage–$4.25 before March 31, 2000, and $5.15 thereafter, N.Y. Lab. Law § 652.1 (2002)–and time and a half for overtime. N.Y.C.R.R. § 142–2.2. Like the FLSA, the New York Labor law defines "employee" broadly, as "including any individual employed or permitted to work by an employer in any occupation." N.Y. Lab. Law § 651(5) (2002). Because New York Labor Law and the FLSA embody similar standards with respect to the legal issues before me, I will consider the federal law in deciding whether defendants were joint employers. *Lopez v. Silverman*, 14 F.Supp.2d 405, 411 n. 4 (S.D.N.Y. 1998) (noting that "the legal issues involved in the plaintiffs' state-law causes of action are governed by the same standards as those applicable to their FLSA claims"); *Zheng v. Liberty Apparel Co.*, No. 99 Civ. 9033(RCC), 2002 WL 398663, at *6 n. 3, 2002 U.S. Dist. LEXIS 4226, at *17 n. 3 (S.D.N.Y. Mar. 13, 2002) (holding that for the purposes of decision, "the same analysis applies for both the FLSA and NYCRR").

### C. Summary Judgment

Summary judgment is warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When parties have filed cross-motions for summary judgment, "each party has an initial burden of informing the court of the basis for its motion and of identifying those parts of the record which it believes demonstrate the absence of a genuine issue of material fact." *Vogel v. W.A. Sandri, Inc.*, 898 F.Supp. 254, 255 (D.Vt.1995). Although all facts and inferences therefrom are to be construed in the light most favorable to the party opposing the motion, *see Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir.2001), the nonmoving party must raise more than just "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen*, 273 F.3d at 499. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Thus, in order for defendants to survive summary judgment, they must come forward with evidence to show that there is a genuine issue of material fact with respect to their status as joint employers.

### III. *Plaintiffs Are Employees of the Hudson/Chelsea Defendants*

There is no dispute that the plaintiffs were hired by one or the other of Scott Weinstein, Hudson Delivery Service, Inc., Steven Pilavin, and Chelsea Trucking, Inc. (also known as Hudson York)–the defendants to whom I have been referring as

"the Hudson/Chelsea defendants." These defendants also do not dispute that they may be treated interchangeably. Thus, if one corporate entity is held liable, that finding may extend to the others. There is also no dispute that the Hudson/Chelsea defendants regarded the plaintiffs as independent contractors, not employees, and until the collective bargaining agreement with Local 338, which became effective March 26, 2000, the Hudson/Chelsea defendants did not keep the records mandated for employees by the FLSA and the New York Minimum Wage Act, did not pay minimum wages or overtime, did not withhold taxes or FICA from payroll, and issued IRS Forms 1099, rather than W–2s.

An employer's characterization of an employee is not controlling, however, for otherwise there could be no enforcement of any minimum wage or overtime law. There would be nothing to prevent old-fashioned labor contractors from rounding up workers willing to sell their labor cheaply, and assigning them to perform outsourced work, without complying with minimum wage requirements. Thus, not the characterization of a hiring hall, but the test of "economic reality," governs how a relationship of employment is to be characterized in relation to the FLSA. *Brock*, 840 F.2d at 1059.

■ In *Brock v. Superior Care, Inc.*, the Court set out an "economic reality" test to distinguish between employees and independent contractors. The test considers five factors: (1) the degree of control exercised by the employer over the workers; (2) the workers' opportunity for profit or loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business. *Id.; United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed.

1757 (1947). No one factor is dispositive; the "ultimate concern" is "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock*, 840 F.2d at 1059.

Normally, the existence and degree of each factor is a question of fact, and the legal conclusion to be drawn from those facts is a question of law. *Id.* Here, however, as the discussion below makes clear, there is no genuine issue of material fact as to plaintiffs' proper status as employees.

■ The Hudson/Chelsea defendants argue that they merely "placed" workers with the Duane Reade stores, and it was the store managers and supervisors, not the Hudson/Chelsea defendants, who exercised control. However, the Hudson/Chelsea defendants were more than a placement agency. Hudson/Chelsea, not Duane Reade, paid the delivery workers, and controlled their hiring, firing, transfer and pay. If a worker assigned to a Duane Reade store met with disfavor, the store manager asked the Hudson/Chelsea defendants to transfer him out and assign someone else. Moreover, the Hudson/Chelsea defendants never offered proof of any license as an employment agency, and did not function, vis-à-vis Duane Reade, in the manner of an employment agency, receiving a commission based on several weeks or months of earnings.

The Hudson/Chelsea defendants' relationship with plaintiffs satisfies the first of the *Brock* considerations, showing a substantial degree of control over the workers. As *Brock* made clear, "[a]n employer does not need to look over his workers' shoulders every day in order to exercise control." 840 F.2d at 1060; *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 140 (2d Cir.1999) (finding the first *Brock* factor

satisfied where putative employer hired employees and "on occasion, supervised and controlled employee work schedules and the conditions of employment"); *Thomas v. City of Hudson,* No. 95–CV–0070, 1996 WL 280828, at *6–*7, 1996 U.S. Dist. LEXIS 7244, at *17–*21 (N.D.N.Y. May 18, 1996); *see also Goldberg v. Whitaker House Co-op.,* 366 U.S. 28, 32–33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (finding homeworkers "employees" where putative employer had power to hire and fire them); *Walling v. Twyeffort, Inc.,* 158 F.2d 944 (2d Cir.1946) (finding tailors, who occasionally did jobs for more than one employer and hired employees to work for them, employees rather than independent contractors). The fact that the Hudson/Chelsea defendants hired, fired, transferred and paid the delivery workers weighs substantially in favor of finding an employment relationship between the Hudson/Chelsea defendants and plaintiffs.

The second consideration of *Brock*—opportunity for investment, and profit or loss—also weighs heavily in favor of an employment relationship. As defendants conceded, plaintiffs' investment in the business was negligible. *Brock,* 840 F.2d at 1059. Plaintiffs are not asked to invest in Duane Reade, Hudson/Chelsea, or their own jobs. Hudson/Chelsea provided the delivery workers with delivery carts that they could rent and uniforms that they could purchase; the workers did not have to make an·up-front investment in such things in order to be hired or assigned to a Duane Reade store.

Hudson/Chelsea argues that delivery services require plaintiffs to exercise "skill and independent initiative," the third consideration of *Brock,* but clearly this is not so in any objective sense. The Duane Reade stores are located throughout Manhattan and the boroughs, and customers typically reside within a neighborhood of a few blocks. Little "skill" or "initiative" is needed to find one's way from a Duane Reade store to a customer's residence. *See, e.g., Gustafson v. Bell Atl. Corp.,* 171 F.Supp.2d 311, 326 (S.D.N.Y.2001) (plaintiff's duties as a chauffeur "required no specialized skill or initiative, suggesting that plaintiff was an employee rather than an independent contractor"); *cf. Brock,* 840 F.2d at 1060 (holding that nurses have special skills and show independent initiative). The third consideration, then, also argues for finding plaintiffs to be employees, not independent contractors.

The fourth consideration, the permanence and duration of the plaintiffs' working relationship with the Hudson/Chelsea defendants, is disputed. Plaintiffs claim that most delivery workers have been working for the Hudson/Chelsea defendants for years, but offer testimony of only four deliverymen, of approximately 500 delivery workers who opted into the lawsuit, to support their claim, and even these four had only a three-year working relationship with the Hudson/Chelsea defendants. Nevertheless, the transience of the work force here says less about the status of the worker than about the nature of the job. Many delivery workers do not endure for long periods of time in this line of work due to the long hours, the low pay, the dangers of the streets, and the vagaries of the weather inherent in delivery work. Any transience of the work force therefore reflects "the nature of [the] profession and not [the workers'] success in marketing their skills independently." *Brock,* 840 F.2d at 1060–61.

The fifth consideration looks at the extent to which the work is integral to the business, and it also weighs heavily in favor of an employment relationship. The Hudson/Chelsea defendants concede that they are engaged primarily in the business of providing delivery services to retail establishments and that plaintiffs perform

the actual delivery work. Thus, plaintiffs' services constitute an integral part of the Hudson/Chelsea defendants' business.

It is clear, from the "economic reality" and the totality of circumstances, that the delivery workers depend upon the Hudson/Chelsea defendants for the opportunity to sell their labor and are not in any real sense in business for themselves. *See id.* at 1059. The delivery workers, as a matter of law, are employees, not independent contractors, and are entitled to summary judgment against the Hudson/Chelsea defendants.

In a footnote in their brief on this motion, plaintiffs state that they seek summary judgment not only for those delivery workers whom the Hudson/Chelsea defendants assigned to Duane Reade stores, but also on behalf of class members who were hired by the Hudson/Chelsea defendants and assigned to supermarket chain stores that had agreements with the Hudson/Chelsea defendants similar to the agreement with Duane Reade. Although plaintiffs point to some evidence in the record that defendant Weinstein treated all of his delivery walkers similarly, regardless of what store he sent them to, I do not believe that such evidence is sufficient to make out a claim for summary judgment on behalf of the delivery workers who worked for the Hudson/Chelsea defendants and were assigned to supermarket chains not named in this action. I therefore defer ruling with respect to these workers, pending further discovery and briefing.

## IV. *Defendants Weinstein and Pilavin Are Individually Liable as Employers*

■ Plaintiffs argue that, along with their companies Hudson Delivery Service, Inc. and Chelsea Trucking, Inc., Scott Weinstein and Steven Pilavin are "employers," and are therefore individually liable

under the FLSA for underpayments of minimum wages and overtime. Plaintiffs are correct.

■ Officers and owners of corporations may be deemed employers under the FLSA where "the individual has overall operational control of the corporation, possesses an ownership interest in it, controls significant functions of the business, or determines the employees' salaries and makes hiring decisions." *Lopez,* 14 F.Supp.2d at 412; *United States Dep't of Labor v. Cole Enters., Inc.,* 62 F.3d 775, 778 (6th Cir.1995) ("One who is the chief executive officer of a corporation, has a significant ownership interest in it, controls significant functions of the business, and determines salaries and makes hiring decisions has operational control and qualifies as an 'employer' for the purposes of FLSA.") (internal citations omitted); *Reich v. Circle C Investments, Inc.,* 998 F.2d 324, 329 (5th Cir.1993) ("[T]he FLSA's definition of employer is sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees.") (internal citation omitted); *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir.1983) ("The overwhelming weight of authority is a corporate officer with operational control of a corporation's covered enterprise is an employer with the corporation, jointly and severally liable under the FLSA for unpaid wages."). In *Herman v. RSR Security Services, Ltd.,* 172 F.3d 132 (2d Cir.1999), the Second Circuit found that a shareholder and member of the board was an "employer" under the FLSA where he had the authority to hire managerial staff, occasionally supervised and controlled employee work schedules, and had the authority to sign payroll checks. The Court empha-

sized that "the overarching concern is whether the alleged employer possessed the power to control the workers in question," *id.* at 139, and looked at the "totality of the circumstances" in determining whether defendant had "operational control." *Id.* at 140. Thus, it did not matter that the putative employer did not directly hire workers, but only managerial staff, and that he did not have direct control over the workers in question; instead, the Court looked at whether he had "operational control" over the business.

Weinstein and Pilavin argue that they should not be held individually liable for underpayments because they did not directly control the delivery workers. Clearly, however, Weinstein and Pilavin exercised operational management of Hudson Delivery and Chelsea Trucking, and that is sufficient under the law to satisfy the broad statutory definition of "employer." *See* 29 U.S.C. § 203(d); *Darden,* 503 U.S. at 326, 112 S.Ct. 1344. Weinstein and Pilavin are the founders, owners, and sole shareholders of Hudson Delivery Service and Chelsea Trucking, and together they personally oversee and operate the companies and their agents on a daily basis. Thus, under *Herman,* each is an "employer" under the FLSA, and can be held individually liable for failure to pay minimum wages to their employees.

Weinstein and Pilavin argue that they could not be said to exercise control over the delivery workers if Duane Reade exercised such control. This argument misses the point; as I discuss below, the FLSA recognizes joint employment, meaning that more than one employer can be responsible for FLSA obligations. *Cole,* 62 F.3d at 778. Because Weinstein and Pilavin had operational control over Hudson Delivery Service and Chelsea Trucking, they are individually liable under the FLSA for any underpayments ·in plaintiffs' salaries. Thus, plaintiffs are entitled to summary judgment against Weinstein and Pilavin, as well as against Hudson Delivery Services, Inc. and Chelsea Trucking, Inc.

## V. *Duane Reade is a Joint Employer*

The FLSA contemplates that more than one employer may be responsible for underpayments of minimum wages and overtime. 29 C.F.R. §§ 791.2(a)-(b). Duane Reade may be liable to plaintiffs for such underpayments, jointly and severally with the Hudson/Chelsea defendants, if Duane Reade was also their "employer" under the FLSA. The issue is determined by an "economic reality" test, *Goldberg,* 366 U.S. at 33, 81 S.Ct. 933; *Danneskjold v. Hausrath,* 82 F.3d 37, 40 (2d Cir.1996); *Carter,* 735 F.2d at 12, which takes into account the real economic relationship between the employer who uses and benefits from the services of workers and the party that hires or assigns the workers to that employer.

In *Rutherford Food Corporation v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947), meat boners who worked on the premises of a slaughterhouse were hired by another employer under contract with the slaughterhouse, much as the delivery workers for Duane Reade were hired to work there by the Hudson/Chelsea defendants. The issue in *Rutherford* was whether the slaughterhouse should be considered the employer of the meat boners when there already was an employer, the head boner who had hired the workers, and also managed and paid them.

The Supreme Court held that the slaughterhouse was a joint employer with the head meat boner for the purpose of minimum wage obligations under the FLSA. The Supreme Court considered that the boners' work was "part of the integrated unit of production," and that the workers did a "specialty" job on the

production line, integral to the entire operation of the line. 331 U.S. at 729, 67 S.Ct. 1473. It was the boners themselves, not their company, functioning like piece-workers on a production line, who used the premises and equipment of the slaughterhouse to do their work, rather than shifting from one slaughterhouse to another as "an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." *Id.* at 730, 67 S.Ct. 1473.

In *Carter v. Dutchess Community College,* 735 F.2d 8, 12 (2d Cir.1984), the Second Circuit considered a work-release program of the New York State Department of Correctional Services ("DOCS"), which assigned inmates to work at sites of private employers. The plaintiff was a prison inmate and, under a DOCS program for college graduates, was assigned to work as a teaching assistant at Dutchess County Community College ("DCC"). DOCS paid plaintiff a stipulated allotment, less than the minimum wage, and plaintiff sued under the FLSA for back wages, punitive damages, and an injunction requiring defendants to pay all tutors, including inmate tutors, the same compensation.

The Second Circuit set out a four-part set of criteria to help determine whether DOCS, or DCC, or both, were "employers" required to pay minimum wages, examining who hired and fired the workers; who supervised and controlled their work schedules and conditions of employment; who determined the rate and method of payment; and who was to maintain employment records. *Id.* at 12. Applying the criteria, the Court of Appeals found that it was DCC that had initially proposed to employ prisoners and suggested the wage to pay them; that DCC had established the standards to decide who would be eligible to be a teaching assistant and had identified several inmates whom it

proposed to accept; that DCC reserved the right to refuse those inmates whom it did not want; and that DCC had decided for how many sessions and for how long an inmate would be permitted to tutor. *Id.* at 15. On this record, the Court of Appeals held that there were questions of fact whether DCC had exercised sufficient control over the prison inmates to make DCC an "employer" required to pay minimum wages and overtime under the FLSA. *Id.* Nevertheless, even taking into account the plaintiff's status as a prisoner, the Court did not rule out the possibility that he had FLSA claims against DCC as an employer, stating that the record, while not perhaps reflecting "the full panoply of an employer's prerogatives," may be sufficient to warrant FLSA coverage. *Id.*

The Second Circuit applied the same criteria in *Herman v. RSR Security Services, Ltd.,* and held that a shareholder and member of the board was an "employer" under the FLSA, because it was he who had the authority to hire managerial staff, to supervise and control employee work schedules, and to sign payroll checks. 172 F.3d at 140.

In *Torres–Lopez v. May,* 111 F.3d 633, 642–44 (9th Cir.1997), farm laborers were procured through a labor agent, who hired them and assigned them to a farm. The Ninth Circuit Court of Appeals found that because these laborers constituted an integral part of the farm's business and because the farm exercised indirect control over them by supervising them and controlling the harvest schedule and the number of workers it needed for harvesting, the farm was a joint employer, along with the labor agent who hired them. *See also Antenor v. D & S Farms,* 88 F.3d 925, 937–38 (11th Cir.1996). Similarly, in *Lopez v. Silverman,* the district court for the Southern District of New York found that where the putative joint employer, a gar-

ment manufacturer, directly monitored the quality of work done by garment cutters, controlled "the substance of the plaintiffs' daily work-both physically and procedurally," and where the garment cutters' work was integral to the manufacturer's work in that they functioned essentially as the manufacturer's own sewing and pressing unit, such a situation weighed heavily in favor of finding a joint employment relationship. 14 F.Supp.2d at 420–21; *see also Liu v. Donna Karan Int'l,* No. 00 Civ. 4221(WK), 2001 WL 8595, 2000 U.S. Dist. Lexis 18847 (S.D.N.Y. Jan. 2, 2001). *But see Zheng v. Liberty Apparel Co.,* No. 99 Civ 9033, 2002 WL 398663, at \*6, 2002 U.S. Dist. LEXIS 4226, at \*19 (S.D.N.Y. Mar. 13, 2002).

Like the meat boners in *Rutherford,* 331 U.S. at 730, 67 S.Ct. 1473, the farm workers in *Torres–Lopez,* 111 F.3d at 642–44, and the garment cutters in *Lopez,* 14 F.Supp.2d at 420, the delivery workers assigned to Duane Reade performed an integral service for the stores in which they worked, enabling Duane Reade to compete more effectively with mail order fulfillment companies and other drug stores by offering drug deliveries to its customers. The delivery workers worked from the premises of the Duane Reade stores, and assisted other workers in those stores with bagging items at check-out counters, stocking shelves, providing security, and making inter-store deliveries.

Duane Reade offers an analogy to Federal Express, United Parcel, and other delivery services, but the analogy is misplaced. Duane Reade's delivery workers worked out of the Duane Reade stores, and not from a central depot; deliveries were made directly from the pharmacy counters to customers' homes, and not via a central facility; and control was exercised throughout by Duane Reade, and not by some independent service. Duane Reade used the delivery workers to extend its shelves and counters to the homes of customers, allowing them the convenience of shopping from home instead of having to come physically into a store. Duane Reade managers and supervisors directed the delivery workers in their tasks, instructing them what to pick up, where to make deliveries, how to log their deliveries, and how much to receive in payment. The delivery workers worked as individuals, and not as a group shifting from store to store according to seasonal and hourly needs. Indeed, it was not until they were organized by Local 338, in March 2000, that they even had a bargaining representative to negotiate for them as a collective. Clearly, the economic reality of the relationship between Duane Reade and the delivery workers reveals that Duane Reade was an employer of the delivery workers, responsible for assuring that they were paid the wages required by the FLSA and the New York Minimum Wage Act as a condition of their employment.

Additionally, the relationship between Duane Reade and the Hudson/Chelsea defendants establishes joint employment. That relationship was "so extensive and regular as to approach exclusive agency." *Lopez,* 14 F.Supp.2d at 421. The Hudson/Chelsea defendants acted directly in the interest of Duane Reade in relation to the delivery workers, 29 C.F.R. § 791.2, and Duane Reade used the Hudson/Chelsea defendants' services almost exclusively, for a lengthy period of years, since 1994, showing consistent dependence on them for delivery services. *See Lopez,* 14 F.Supp.2d at 421.

I therefore hold, looking at the "circumstances of the whole activity," that plaintiffs were economically dependent on both the Hudson/Chelsea defendants and Duane Reade, *see Antenor,* 88 F.3d at 938, and that both were their "employers" under

the FLSA and the New York Minimum Wage Act.

## VI. *Period of Liability*

On March 26, 2000, a collective bargaining agreement signed by the plaintiffs, who had joined Local 338, Retail, Wholesale and Department Store Workers Union, AFL–CIO, and the Hudson/Chelsea defendants went into effect. Under the terms of the agreement, workers who worked for a drugstore were to receive minimum wage, of which $1.65 could be tip credit. Pursuant to these terms, the Hudson/Chelsea defendants paid plaintiffs who worked for Duane Reade at a rate starting at $4.20 per hour, and added to that a tip credit of $.95 per hour (depending on hours worked, between $25–$39 per week), the total being equal to the minimum wage. The record is uncertain, however, if the $.95 per hour credited to plaintiffs on their paystubs actually reflects reality. These paystubs show that plaintiffs properly were credited between $25–$39 a week in tips. However, in two affidavits, plaintiffs testify that they really earned only $5–$15 per week in tips.

The evidence is not sufficient to allow summary judgment to be granted with respect to the period after March 26, 2000. Discovery shall continue with respect to the provision of minimum wages between March 26, 2000 and May 24, 2001, the closing date of the class period, and the parties should re-file their motions upon further factual development, more thorough briefing, and presentation of any applicable regulations. I invite counsel for Local 338 and the New York State Attorney General's Office also to brief the issue.

The impact on Duane Reade, with respect to the post-March 26, 2000 period, is also uncertain. Did Duane Reade have the right to rely on the collective bargaining agreement, and is its good faith a defense? These issues, too, should be addressed by all those interested, including Local 338 and the New York State Attorney General's Office.

## VII. *Conclusion*

Duane Reade had the right to "outsource" its requirement for delivery services to an independent contractor, here the Hudson/Chelsea defendants, and seek, by such outsourcing, an extra measure of efficiency and economy in providing an important and competitive service. But it did not have the right to use the practice as a way to evade its obligations under the FLSA and the New York Minimum Wage Act. Both Duane Reade and the Hudson/Chelsea defendants were the "employers" of the plaintiffs under these laws, jointly and severally obligated for underpayments of minimum wage and overtime during the period between January 13, 1994 and March 26, 2000.

All plaintiffs who were hired by or worked for the Hudson/Chelsea defendants, were assigned to a Duane Reade store, and made deliveries mainly on foot are entitled to summary judgment against the Hudson/Chelsea defendants and Duane Reade, jointly and severally. With respect to plaintiffs who were hired by the Hudson/Chelsea defendants and were assigned to a supermarket chain not named as a defendant in this suit and plaintiffs who worked for a Duane Reade store by beeper service, van service, or as part of a shared service, the cross-motions for summary judgment are deferred.

SO ORDERED.