Rehearing granted, October 24, 2006

**CORRECTED OPINION**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

DOUGLAS C. SCHULTZ; ANTHONY D.
PHINIEZY; MELISSA J. LOPES; STEVEN
ROWE; JARED C. BAKER,
            *Plaintiffs-Appellants,*

v.

CAPITAL INTERNATIONAL SECURITY,
INCORPORATED; OUSAMA ALHBRI,
a/k/a Sammy Hebri,
            *Defendants-Appellees.*

No. 05-1192

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CA-04-346-A)

Argued: May 24, 2006

Decided: October 24, 2006

Before WILKINS, Chief Judge, and WILLIAMS and
MICHAEL, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Michael wrote the opinion, in which Chief Judge Wilkins and
Judge Williams joined.

---

## COUNSEL

**ARGUED:** Charles W. Gilligan, O'DONOGHUE &
O'DONOGHUE, Washington, D.C., for Appellants. Haig Vahan Kal-

bian, KALBIAN & HAGERTY, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Francis J. Martorana, Sally M. Tedrow, O'DONOGHUE & O'DONOGHUE, Washington, D.C., for Appellants. Claire A. DeLelle, KALBIAN & HAGERTY, L.L.P., Washington, D.C., for Appellees.

## OPINION

MICHAEL, Circuit Judge:

Prince Faisal bin Turki bin Nasser Al-Saud (the Prince) is a diplomat and a member of the Saudi royal family. The Prince, who has a residence in McLean, Virginia, engaged Capital International Security, Inc. (CIS) to provide a personal security detail. Five of the agents who worked on the Prince's detail sued CIS and its president, Sammy Hebri, asserting claims for unpaid overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (FLSA or Act). After a bench trial the district court entered judgment for CIS and Hebri, holding that the agents were not entitled to overtime pay because they were independent contractors, not employees. The agents appeal, and we vacate the judgment in favor of the defendants and remand the case for further proceedings on the overtime claim. The undisputed facts compel the legal conclusion that the Prince and CIS were joint employers and that the agents were their employees for purposes of the FLSA. CIS will be jointly and severally liable on remand for the payment of any overtime required by the FLSA during the agents' employment. Hebri is also alleged to be an employer, and the district court should make a determination with respect to his status and liability, if any. We affirm the evidentiary rulings challenged by two of the agents.

I.

The facts in this case are essentially undisputed. The following account is based on the district court's findings and other uncontroverted facts established at trial. The plaintiffs, Douglas Schultz, Anthony Phiniezy, Melissa Lopes, Steven Rowe, and Jared Baker, were "personal protection specialists" (PPS agents) licensed by the

Virginia Department of Criminal Justice Services (VDCJS). Licensed PPS agents "engage[ ] in the duties of providing close protection from bodily harm to any person." Va. Code Ann. § 9.1-138. A PPS agent may operate his own security business in Virginia if he obtains a private security business license from the VDCJS. *Id.* § 9.1-139(A). Although all five plaintiffs had at some point obtained individual PPS licenses, none of them had the additional license required to operate a security business.

The plaintiff-agents provided security services for the Prince and his family at the Prince's Virginia residence in twelve-hour shifts. The agents were paid a daily rate for each shift; they received no extra pay for overtime. The agents had a command post at the residence, from which they observed security camera monitors, answered the telephone, and kept a daily log of all arrivals and departures. They also made hourly walks of the property, ensured that members of the Prince's family were safe when departing and arriving, sorted mail, and performed various tasks upon request of the Prince's family. In addition to their security duties, the agents were responsible for having the household's vehicles washed and fueled, making wake up calls, moving furniture, and doing research on the Internet. Although the nature of the work the agents performed for the Prince remained more or less the same throughout their employment, certain facts bearing on whether they were employees or independent contractors changed over time.

In 1998 a company called Vance International, Inc. (Vance) supplied the Prince's security detail. Vance submitted bills for its services to the Saudi Embassy, which paid for the Prince's detail because he was a diplomat representing the Royal Kingdom of Saudi Arabia. From the beginning, plaintiffs Schultz and Phiniezy worked for Vance on the Prince's detail. The other three plaintiffs joined the detail later, sometime between 1998 and 2002. Vance trained the agents assigned to the detail and helped them obtain their Virginia PPS licenses. The detail was led by two men: a Vance employee named Randy Parham and an employee of the Prince, Sami Abushalback. Abushalback, a former Vance employee, was the Prince's head of security and personal secretary. During the time Vance was involved with the detail, Parham and Abushalback drafted a document called the Standard Operating Procedure (SOP), which specified how the detail would

operate. Vance representatives visited the detail on site each month to perform an audit. Vance also randomly removed agents from the detail and assigned them to serve other Vance clients.

In 1998 the Prince and Abushalback decided to terminate Vance's services. The Prince became unhappy with Vance because it changed agents frequently, exercised too much control over the agents, and wanted too many reports. After the decision to terminate Vance, Abushalback approached Parham, Phiniezy, Schultz, and two other Vance employees and asked them if they would continue working for the Prince under a new company, FAM International (FAM). The agents agreed. Because the agents had each signed a non-competition agreement with Vance, the company sued and obtained an injunction. The Prince contributed between $50,000 and $60,000 to settle the case. He also paid each agent $1,000 because none of them could work during the litigation. Once FAM took over the detail, Abushalback exercised more control over the agents.

In July 2002 the Prince terminated FAM's contract because FAM could not float the funds to meet its biweekly payroll obligations while awaiting payment from the Saudi Embassy. Around this time, the Prince's long-time driver and travel agent, Sammy Hebri, formed a company called Capital International Security, Inc. (CIS). Hebri started CIS for the purpose of replacing FAM as the Prince's security contractor. Hebri had no prior experience in the private security business. Abushalback negotiated an oral contract with Hebri for CIS to administer the detail. CIS had virtually no involvement in the detail's day-to-day operations. In fact, when CIS took over the detail, neither CIS nor Hebri was given a copy of the detail's SOP. Parham, who was the detail leader throughout the transition period, reported to Abushalback. With Parham's input, Abushalback decided each agent's work assignments. Parham did, however, send CIS approximately seventeen status reports on detail operations and issues between July 2002 and the filing of this lawsuit in March 2004.

CIS was involved to a degree in the detail's personnel matters. CIS helped recruit new agents by placing advertisements in newspapers and screening resumes for applicants with PPS licenses. CIS forwarded screened resumes to Parham, but it did not interview applicants or otherwise participate in hiring decisions. Parham reviewed

the selected resumes and conducted interviews. Abushalback had the final say on hiring, though he usually deferred to Parham. Parham notified CIS when a new agent was hired, and CIS then added the person to payroll. When Parham, the detail leader, resigned in January 2004, Abushalback chose the new leader, Bob Hillyard, without input from CIS.

Abushalback generally handled scheduling, compensation levels, discipline, and termination of detail members, although CIS also played a limited role in these matters. For instance, in April 2003 the agents requested a meeting with Hebri to discuss their pay rate. Hebri raised the pay issue with Abushalback, who told Hebri that there was "no need for anybody to have anything." J.A. 439. CIS then sent a letter to the agents explaining that "due to circumstances beyond the control of [CIS], [the company] will not be able to discuss pay raises until January 2004." J.A. 81. Also, in March 2004 Hebri sent a memo to the agents threatening disciplinary action against any agent found carrying a firearm he was not trained to use. CIS and the Prince both provided equipment to the detail. Although most detail members carried their own personal handguns, CIS provided handguns for those agents who did not carry their own. CIS also provided the agents with radios, holsters, first aid kits, business cards, and lapel pins, while the Prince provided cars, cameras, cell phones, and office supplies.

Shortly after CIS replaced FAM, Hebri sent a memo (dated July 24, 2002) to the agents directing them to obtain their own private security business licenses from the VDCJS and individual liability insurance so they could be classified as independent contractors. The memo explained, "If the agent does not have these licenses [he] would have to be hired as an employee . . . . Employees would come under the liability coverage and business license of [CIS]." J.A. 79. In follow-up letters to the agents on July 25, Hebri added that detail members must secure the licenses and liability insurance (in other words, "have independent contractor status") by September 1, 2002, or "be relieved of duty" from the detail. J.A. 80. Schultz, who had allowed his PPS license to expire, brought these communications to Abushalback because he was concerned about losing his job. Abushalback told Schultz that he had nothing to worry about because Hebri was just "trying to cover his butt." J.A. 278. Schultz disregarded the warnings. CIS did not enforce the licensing and insurance

requirements for the next fourteen months, though Hebri asked Parham periodically whether the agents were taking steps to comply.

In January 2004 the VDCJS audited CIS's operations. In the face of the audit, Hebri again informed the agents that those without individual business licenses and liability insurance would be reclassified as employees and paid an hourly rate. Hebri also said that those not meeting the requirements would have to sign employee agreements setting forth new hourly rates or be removed from the detail. Plaintiffs Lopes and Rowe had resigned months earlier, but Schultz, Phiniezy, and Baker were still working on the detail and had not obtained the business licenses or insurance. Phiniezy and Baker signed employee agreements that decreased their rate of pay, though their duties did not change. Schultz, who lacked a current PPS license, was reclassified as an "alarm responder" and his pay was decreased. J.A. 95. The latter three agents all resigned within a short time.

On March 29, 2004, the five plaintiffs sued CIS and Hebri for unpaid overtime under the FLSA. *See* 29 U.S.C. § 207(a)(2). After the lawsuit was filed, plaintiffs Phiniezy and Baker relocated to Iraq to work for private security contractors. At the time of their departure, Phiniezy had already given a deposition, but Baker had not. The defendants moved to compel Baker to appear for a deposition, and a magistrate judge ordered him to participate in a telephonic deposition and to appear in person for a deposition at least 48 hours before trial. Although Baker gave a telephonic deposition (not under oath) from Iraq, he did not appear in person for a pretrial deposition. Neither Baker nor Phiniezy appeared at trial. About a week before trial, the defendants filed a motion to compel Baker's deposition or, in the alternative, to dismiss Phiniezy's and Baker's claims for failure to prosecute. The court denied the defendants' motion to dismiss, but ruled that Baker and Phiniezy could not offer evidence at trial. It appears that the court enforced these rulings not only by excluding Baker's and Phiniezy's depositions, but also by considering the evidence admitted as applying to the claims of all plaintiffs.

The defendants' sole defense at trial was that the agents were not covered by the FLSA because they were independent contractors, not employees as defined by the Act. After a three-day bench trial, the district court ruled against the plaintiffs, holding that they were inde-

pendent contractors, and entered judgment in favor of CIS and Hebri. This appeal followed.

## II.

The agents contend that the undisputed facts compel the legal conclusion that they were employees, not independent contractors. The ultimate conclusion as to whether a worker is an employee or independent contractor under the FLSA presents a legal question that we review de novo. *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1044-45 (5th Cir. 1987); *cf. Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 713-14 (1986) (observing that the determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question); *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004) (same).

The FLSA was enacted to protect "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)). "[B]ecause the Act is remedial and humanitarian in purpose, it should be broadly interpreted and applied to effectuate its goals." *Id.* (internal citation and quotation marks omitted). The FLSA, in addition to mandating a minimum wage for covered employees, requires the payment of overtime for each hour worked in excess of forty per work week. 29 U.S.C. §§ 206(a)(1), 207 (a)(1).

An employee is defined as "any individual employed by an employer," *id.* § 203(e)(1), and an "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee," *id.* § 203(d). In addition, the Act "defines the verb 'employ' expansively to mean 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g)). These definitions broaden "the meaning of 'employee' to cover some [workers] who might not qualify as such under a strict application of traditional agency [or contract] law principles." *Id.* In determining whether a worker is an employee covered by the FLSA, a court considers the "economic realities" of the relationship between the worker and the putative employer. *Henderson v.*

*Inter-Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994) (citing *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)). The focal point is whether the worker "is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself." *Id.* (internal quotation marks and alteration omitted); *see also Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976).

The emphasis on economic reality has led courts to develop and apply a six-factor test to determine whether a worker is an employee or an independent contractor. The factors are (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business. *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 671 (D. Md. 2000); *see also Henderson*, 41 F.3d at 570. (These factors are often called the "*Silk* factors" in reference to *United States v. Silk*, 331 U.S. 704 (1947), the Supreme Court case from which they derive.) No single factor is dispositive; again, the test is designed to capture the economic realities of the relationship between the worker and the putative employer. *Henderson*, 41 F.3d at 570.

Applying the *Silk* test, the district court concluded that the agents were independent contractors, not FLSA-covered employees. The district court's analysis focused primarily on the first *Silk* factor, and the analysis compared the minimal control CIS had over the agents with the high degree of control exercised by the Prince. Although control is an important part of the *Silk* test, the issue is not the degree of control that an alleged employer has over the manner in which the work is performed in comparison to that of *another employer*. Rather, it is the degree of control that the alleged employer has in comparison to the control exerted by the *worker*. The district court therefore erred by weighing the degree of control exercised by CIS against that exercised by the Prince. The court should have instead weighed the

agents' control against the total control exercised by CIS and the Prince. In taking this wrong turn, the district court strayed from the ultimate question posed by the *Silk* test: whether the agents were, as a matter of economic reality, dependent on the business they served, or, conversely, whether they were in business for themselves. *See Bartels*, 332 U.S. at 130; *Henderson*, 41 F.3d at 570. Before the *Silk* test can be correctly applied in this case, the established facts must be reviewed to identify the putative employer or employers. As the discussion below reveals, CIS and the Prince were joint employers who must be viewed as providing "one employment" for purposes of the FLSA. When the *Silk* test is applied to this joint employment arrangement, the inescapable legal conclusion is that the agents were employees, not independent contractors.

### A.

Separate persons or entities that share control over an individual worker may be deemed joint employers under the FLSA. According to the Department of Labor regulation:

> if the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as *one employment* for purposes of the [FLSA].

29 C.F.R. § 791.2(a) (emphasis added); *see also Falk v. Brennan*, 414 U.S. 190, 195 (1973) (observing in a FLSA case that apartment building maintenance workers were employed by both building management company and building owners). "[A]ll joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA], including the overtime provisions." 29 C.F.R. § 791.2(a). The regulation states that "a joint employment relationship generally will be considered to exist in situations such as:"

> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b) (footnotes omitted). The joint employment inquiry must "take[ ] into account the real economic relationship between the employer who uses and benefits from the services of workers and the party that hires or assigns the workers to that employer." *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 193 (S.D.N.Y. 2003); *see also Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 674-76 (1st Cir. 1998); *Bonnette v. Calif. Health & Welfare Agency*, 704 F.2d 1465, 1469-70 (9th Cir. 1983). The ultimate determination of joint employment must be based upon the "circumstances of the whole activity." *Bonnette*, 704 F.2d at 1470.

The undisputed facts in this case show that CIS and the Prince were joint employers of the agents.[1] The agents performed work "which simultaneously benefit[ted]" both CIS and the Prince. 29 C.F.R. § 791.2(b). Moreover, the entire employment arrangement fits squarely within the third example of joint employment in the regulation: the Prince and CIS were "not completely disassociated with respect to the employment of [the agents]," and the Prince "share[d] control of the [agents]" with CIS. *Id.* § 791.2(b)(3). Both the Prince and CIS were involved in the hiring of agents, although the Prince (through Abushalback) exercised a greater degree of authority. CIS advertised for agents and screened responses, which were forwarded to the detail leader. The detail leader, who was on the CIS payroll and reported to Abushalback, interviewed selected applicants; Abushal-

---

[1]We recognize that in certain cases it may be necessary to first determine whether a party is an "employer" for FLSA purposes before determining whether a joint employment arrangement exists.

back had the final word on hiring. Abushalback generally handled agent work schedules, compensation, discipline, and terminations, but CIS played some role in these matters. CIS maintained the authority to discipline agents and change the terms of their employment. For example, CIS warned the agents in writing that "disciplinary action [would] be instituted" by the company against any agent who carried a firearm he was "not trained on." J.A. 115. In one instance an agent discussed his concerns about CIS's new licensing and insurance requirements with Abushalback, who told the agent he had nothing to worry about. However, when this agent failed to comply with the requirements, CIS eventually demoted him and cut his pay. In addition, the Prince and CIS shared responsibility for supplying the agents with equipment.[2]

### B.

Because CIS and the Prince were joint employers of the agents, the employment arrangement must be viewed as "one employment" for purposes of determining whether the agents were employees or independent contractors under the FLSA. *See* 29 C.F.R. § 791.2(a). The district court therefore should have focused its *Silk* inquiry on the one employment provided jointly by the Prince and CIS. The one-employment focus leads to a proper determination of whether, as a matter of economic reality, the agents were dependent on the joint employers or whether they were in business for themselves. *See Bartels*, 332 U.S. at 130; *Henderson*, 41 F.3d at 570. When the undisputed facts are examined using this correct legal framework, it becomes evident that the agents were FLSA-covered employees, not independent contractors.

---

[2]Again, the undisputed facts here fit readily within the third example of joint employment listed in the regulation. *See* 29 C.F.R. § 791.2(b)(3). In some cases it may be useful for a court to consider factors such as those listed in *Bonnette*, 704 F.2d at 1469-70, and *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 71-72 (2d Cir. 2003), in determining whether there are joint employers within the meaning of the Act and the regulation.

1.

The first *Silk* factor is the degree of control that the putative employer has over the manner in which the work is performed. When the employment arrangement here is considered as one employment by the Prince (acting through Abushalback) and CIS, the joint employers exercised nearly complete control over how the agents did their jobs. The eight-page SOP — written and issued by Abushalback and the detail leader — strictly dictated the manner in which the agents were to carry out their duties of providing security for the Prince and his family. For instance, the SOP directed agents to "[m]ake hourly walks" of the property, J.A. 72, to "make regular checks at all locations where contractors are working," J.A. 74, and to escort contractors in and out of the residence through a specific set of doors. The SOP even dictated the exact manner in which the agents were to open the front door of the residence when the Prince arrives: "[The agent] will open the door for Prince Faisal (if he is alone) or for Princess Reema if they are together and have no security with them. If security is with them then the outside agent will open the door for Prince Faisal and leave the door for Princess Reema to be opened by the security agent that is with them." J.A. 73. While there were no doubt occasions when the agents were required to exercise independent judgment (such as determining whether a particular visitor appeared suspicious), as a general rule they did not control the manner in which they provided security.

2.

The second *Silk* factor is whether the worker has opportunities for profit or loss dependent on his managerial skill. In determining that this factor weighed against finding employee status, the district court offered reasoning that does not support its ultimate conclusion:

> The number of hours that these individuals worked on the detail depended upon the shift. The shift schedule was developed by Mr. Parham [the detail leader] after consulting with the agents. Mr. Parham and Mr. Abushalback made judgments about who would travel overseas. But again whether or not a person participated in the schedule,

whether it was one day or every day depended in part upon
their desire, availability and the need.

J.A. 522. Agents who were assigned to travel duty were often given
cash bonuses, gifts, or days off with pay. The receipt of these perqui-
sites did not depend on managerial skill, however. There is no evi-
dence the agents could exercise or hone their managerial skill to
increase their pay. CIS paid the agents a set rate for each shift
worked. The Prince's schedule and security needs dictated the number
of shifts available and the hours worked. There was no way an agent
could finish a shift more efficiently or quickly in order to perform
additional paid work. *Cf. Herman*, 164 F. Supp. 2d at 674 (noting that
cable installers can control their own profits and losses "by improving
their technique so that they can service more customers faster"). The
agents' security work was, by its very nature, time oriented, not proj-
ect oriented. The second *Silk* factor weighs in favor of employee sta-
tus for the agents.

3.

The third factor is the worker's investment in equipment or materi-
als required for the task, or his employment of other workers. This
factor weighs heavily against a conclusion that the agents were inde-
pendent contractors. CIS and the Prince supplied almost every piece
of equipment the agents used: radios, holsters, cell phones, cars, cam-
eras, first aid kits, business cards, and lapel pins. Although some
agents chose to use their own firearms, CIS supplied firearms to those
who wanted them. The agents were thus not required to invest in any
equipment or materials. In addition, the agents could not hire other
workers to help them do their work.

Although the agents arguably had an investment in their individual
PPS licenses, this investment is immaterial for our purposes. Licens-
ing is required of all persons working as personal protection special-
ists in Virginia regardless of whether they are employees or
independent contractors. More telling is the licensing and insurance
that the five plaintiff-agents did not obtain, despite CIS's flaccid
requests: the individual business licenses and individual liability
insurance. Because the agents were never compelled to obtain these
credentials while they worked on the Prince's security detail, they

continued to operate under the authority of CIS's license and the protection of the company's liability insurance.

4.

The fourth *Silk* factor is the degree of skill required for the work. In concluding that this factor weighed against employee status, the district court said, "I think that personal security requires special skills." J.A. 523. This observation cannot end the inquiry, however, because it applies to many workers, regardless of whether they are independent contractors or employees. Of course, a licensed PPS agent can be expected to offer more specialized services than the average private security guard, and providing security for a diplomat and members of a royal family surely presents special challenges. Although these points could weigh in favor of concluding that the agents were independent contractors, there are important countervailing factors. The agents' tasks were, for the most part, carefully scripted by the SOP. Moreover, many of their tasks required little skill, for example, sorting the mail, making wake up calls, moving furniture, providing newspapers for the Prince, and checking the *Dallas Morning News* website for updates about the Dallas Cowboys. Although we are mindful of the district court's observation about the need for special skills, we do not see the skill factor as tipping significantly one way or the other.

5.

The fifth factor is the degree of permanency of the working relationship. The more permanent the relationship, the more likely the worker is to be an employee. As to this factor the district court noted only that the real working relationship here was with the Prince, not CIS. Indeed, when the Prince is viewed as one of the joint employers, this factor weighs heavily in favor of a conclusion that the agents were employees. Two of the five plaintiffs began working on the Prince's detail in 1998, when Vance had the contract. These agents chose to stay after the Prince terminated his contract with Vance, even though their decision exposed them to liability under the non-compete agreements they had signed with Vance. The Prince contributed money to settle Vance's lawsuit against the agents, and he compensated the agents for their lost earnings. More important, the Prince ter-

minated Vance in part because it changed agents too often. When CIS took over the detail, it hired the agents who were already working on the Prince's detail. The Prince clearly wanted security agents who would be with him over the long term, and CIS worked to oblige the Prince in this regard.

6.

The sixth (and last) *Silk* factor is the extent to which the service rendered by the worker is an integral part of the putative employer's business. CIS was formed specifically for the purpose of supplying the Prince's security detail, which appears to have been CIS's only business function during the period relevant to this case. The agents were thus an integral part of CIS's business. Insofar as the "business" of the Prince's residence can be characterized as general housekeeping, the agents' service was likewise integral. The agents ensured the safety of the Prince and his family and guests and performed administrative and personal tasks that no doubt helped the household run smoothly.

In sum, the district court committed legal error by applying the *Silk* test without first determining whether a joint employment relationship existed. The undisputed facts establish that CIS and the Prince were joint employers: the agents performed work that simultaneously benefitted CIS and the Prince, who shared control over the agents' work. When the *Silk* factors are applied to the joint employment circumstance, it becomes apparent that the agents were not in business for themselves. The agents were thus employees, not independent contractors.

III.

Plaintiffs Baker and Phiniezy, who did not appear for trial, argue that the district court erred in ruling that they could not offer evidence. When the district court made this ruling at the beginning of trial, it was faced with conflicting motions from the parties. The defendants had moved to compel Baker's deposition or, in the alternative, to dismiss Baker's and Phiniezy's claims for failure to prosecute. Plaintiffs' counsel, in turn, had moved to admit excerpts of Baker's and Phiniezy's depositions. Although the court's ruling that Baker

and Phiniezy could not present evidence was stated in broad terms, the court pointedly denied the motion to dismiss the claims of these two plaintiffs.

The court specifically refused to allow plaintiffs' counsel to introduce excerpts of Baker's telephonic, unsworn deposition on the ground that he had violated the magistrate judge's order by failing to appear for a live deposition immediately before trial. The court also precluded plaintiffs' counsel from offering excerpts of Phiniezy's deposition on the ground that Phiniezy made a "deliberate judgment" not to return to court for trial. J.A. 206; *see* Fed. R. Civ. P. 32(a)(3)(B) ("The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds . . . that the witness . . . is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition."). We review a district court's evidentiary rulings for abuse of discretion. *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004). An evidentiary ruling that is an abuse of discretion is reversible only if it affects a party's substantial rights. *See* Fed. R. Evid. 103(a).

These evidentiary rulings were not an abuse of discretion. As the district court observed, Baker and Phiniezy were aware of the trial date but made a conscious decision not to appear. But even if the rulings had been an abuse of discretion, we would not reverse because the nonattending plaintiffs fail to show that any error affected their substantial rights. The district court noted at the outset of its findings and conclusions that "the question presented is whether or not" the five plaintiffs, including Baker and Phiniezy, were employees under the FLSA and therefore entitled to overtime. J.A. 486. The district court decided only the liability issue, but on that issue all five plaintiffs received the same consideration with respect to the admitted evidence. This treatment is consistent with the district court's refusal to dismiss Baker's and Phiniezy's claims on account of their nonattendance. It also appears that the district court admitted some evidence relevant to the overtime or damages claimed by Baker and Phiniezy. Courts have, of course, "frequently granted back wages under the FLSA to non-testifying employees based upon the representative testimony of a small percentage of the employees." *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985). We do not interpret the district court's evidentiary rulings to preclude an award of over-

time (or damages) to Baker and Phiniezy, if the amounts can be reliably calculated based on evidence admitted without qualification at trial. In any event, the district court's evidentiary rulings with respect to Baker and Phiniezy are affirmed to the extent they were enforced during trial.

## IV.

The five plaintiff-agents were employees under the FLSA. Because defendant CIS was one of their joint employers along with the Prince, CIS is jointly and severally liable for the payment of any overtime required by the FLSA during the agents' employment. Accordingly, we vacate the judgment entered in favor of defendants CIS and Sammy Hebri and remand the case for further proceedings consistent with this opinion. We offer no opinion as to the liability of Hebri, who is also alleged to be an employer. A determination with respect to Hebri's status and liability, if any, should be made by the district court in the first instance. We affirm the district court's evidentiary rulings challenged by plaintiffs Baker and Phiniezy.

*AFFIRMED IN PART*,
*VACATED IN PART*,
*AND REMANDED*